**Kyriakos TSIOLIS, Plaintiff,**

v.

**INTERSCOPE RECORDS, INC., Aftermath Entertainment, and Andre Young (a/k/a "Dr. Dre"), Defendants.**

**No. 96 C 6318.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 8, 1996.

Andrew Grimes Neal, Chicago, IL, Peter Robert Sonderby, Peter R. Sonderby, P.C., Chicago, IL, for Kyriakos Tsiolis.

## OPINION AND ORDER

NORGLE, District Judge:

May a band named "Aftermath" keep other musicians from using the word "Aftermath" for the name of an album or record label where the bandleader holds a registered trademark to the word "Aftermath"? Not at this early juncture. Plaintiff's motion for preliminary injunction is denied. All parties shall appear for trial on December 10, 1996 at 10:00 a.m.

### I.

This is an action for unfair competition, federal and common law trademark infringement, deceptive trade practices and trademark dilution. It arises out of Defendants' present and threatened use of the name "Aftermath" in connection with their promotion and distribution of popular music works. Plaintiff Kyriakos Tsiolis' ("Tsiolis") Complaint includes the following counts and alleged causes of action: Count I, Federal Trademark Infringement in violation of 15 U.S.C. § 1114(1); Count II, Unfair Competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Count III, Common Law Trademark Infringement; Count IV, Deceptive Trade Practices in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/1; and Count V, Antidilution in violation of the Illinois Antidilution Statute, 765 ILCS § 110/1.

### A. Aftermath: The Band

Tsiolis, also known as "Charlie," organized a "heavy metal" musical group in 1985. In 1986, the band members agreed upon a name

for the band, "Aftermath" ("the Band"). The Band recorded an initial "demo" cassette tape later in 1986, self-titled "Aftermath," of which the Band distributed approximately one-hundred copies to local heavy metal concert-goers at no charge. In 1987, the Band recorded and released a second demo tape, named "Killing The Future," of which the band distributed approximately one-thousand copies. In 1989, the Band recorded and released a third demo tape, titled "Words That Echo Fear." The Band distributed approximately 2,500 copies of the "Words That Echo Fear" album. The Band both dispensed free and sold the copies of the latter two demo tapes.

In 1991, Tsiolis applied for, and obtained, an Illinois Trade Name Registration for the name "Aftermath." In 1992, the United States Patent and Trademark Office ("USPTO") issued to Tsiolis Registration Number 1,692,053 for the Service Mark "Aftermath." The USPTO registered the mark for Tsiolis' use in connection with musical performances, audio recordings and productions.

At its inception, the Band attempted to market itself as an "underground band," one which rejects mass appeal and prides itself on having a small, local following. However, with increased media exposure of the "Words That Echo Fear" demo tape, the Band received offers for recording contracts from several entertainment companies, also known as record labels, which produce and market various musical artists. The Band entered into a contract with Big Chief Records ("Big Chief") in New York City, which had distribution arrangements through Warner Brothers Records. Big Chief contracted to record, produce, and market an album named "Eyes of Tomorrow," with an option to similarly produce and market subsequent records. Unfortunately for the Band, Big Chief went bankrupt in 1991, prior to the completion of recording the album. Instead of attempting to sign with another record label, the Band chose to fund the completion of the album. The Band members spent approximately $4,500 of their own funds to buy the master of the recording for "Eyes of Tomorrow," and Tsiolis and his brother then formed their own record label, Zoid Recordings. Tsiolis

then released the "Eyes of Tomorrow" compact disc ("CD") under the Zoid Recordings name in October 1994. Thereafter, Tsiolis and the Band entered into a distribution deal for the "Eyes of Tomorrow" album with a commercial distributor, Feedback Distribution, through its in-house label, Thermometer Sound Surface ("Feedback/Thermometer"). Feedback/Thermometer reissued "Eyes of Tomorrow" in both CD and cassette tape versions.

A computer printout generated by Soundscan, Inc. ("Soundscan") shows that, as of October 13, 1996, retailers in this country sold 164 copies of the "Eyes of the Tomorrow" album, including 143 CDs and 21 cassette tapes. Of the total number of copies sold, 132 (or more than 80%) were sold in Chicago. Soundscan compiles its information based on an electronic reading of computer bar codes as sales are made in retail outlets. However, Tsiolis notes that the sale of albums in outlets not equipped with computer equipment, or not provided with Soundscan computer instruments, does not register on the printout. Tsiolis states that many of the retail stores selling the "Eyes of Tomorrow" CD are not Soundscan-equipped.

In addition to the distribution of records under the name Aftermath, the Band has also given at least 33 live performances since its inception, or an average of three times per year, including three years at the Milwaukee Metal Fest, the largest annual festival featuring "metal" music. However, the Band has yet to perform live in 1996, and performed only three times in 1995. In connection with the promotion and sale of its CDs and cassette tapes, the band directly or through its distributors placed advertisements and prepared promotional items such as t-shirts, bumper stickers and posters on which the name Aftermath is prominently displayed. Through the sale of albums and promotional material, the band generated slightly less than $50,000, or an average of $5,000 per year. The Band's largest grossing musical performance earned it $600.

Tsiolis and his brother testified that the band and its members spent their own money for the promotion of the band and its work, including $25,000 for musical instru-

ments and equipment, a promotional trip to Europe that cost approximately $28,000 in costs and expenses, as well as other expenditures. However, Tsiolis failed to proffer receipts or any other evidence to support his testimony regarding these expenditures.

Though the band has yet to reach mainstream fame, the band has attracted media attention. Its demo tapes were noted or discussed at least over forty times in various magazines directed to music fans (and at least once in the *Chicago Tribune* ) as well as over 120 times in domestic and international "Fanzine" newsletters, which are both published and distributed by fans of the Band. Its "Eyes of Tomorrow" album received critique and review approximately seventy times in music magazines concentrating on the heavy metal music genre, as well as in the *Chicago Sun–Times,* the *Chicago Tribune* and the *Chicago Reader* and foreign publications. At the hearing, counsel for Defendants repeatedly objected on relevance grounds to evidence that Tsiolis is well-known outside of the United States. It is well-settled, however, that the Lanham Act reaches all commerce that Congress can regulate, and that Congress "has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits." *Scotch Whisky Ass'n v. Barton Distilling Co.,* 489 F.2d 809, 812 (7th Cir.1973) (citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 285–86, 73 S.Ct. 252, 255–56, 97 L.Ed. 319 (1952)). The band also received 923 letters from virtually every state in the United States, as well as from over 1,100 letters from 36 other countries.

The record makes clear that Tsiolis and his brother attempt to patrol the entertainment world for potential infringements of its mark. Whenever Tsiolis or his brother learned that other individuals or bands used the name "Aftermath," they wrote letters demanding that the infringing activity cease.

Tsiolis has high expectations for the release of another album, which purportedly is "ready to go." However, Tsiolis refuses to release the new album until the instant controversy is settled. Still, Tsiolis seeks to use the "Aftermath" mark to obtain "global domi-nation" for the Band. In the meantime, the court observes, Tsiolis continues his full-time employment with a distinct and unrelated company.

### B. The Alleged "Aftermath" Infringers

Defendant Andre Young is a well-known musician and producer of popular music, including music fitting within the genres of rap, hip hop, and rhythm and blues ("R & B"). He is known in the music world as "Dr. Dre." Dr. Dre either produced or recorded over twenty albums, of which consumers purchased thirty million copies. Defendant Interscope Records, Inc. ("Interscope") is principally known for the production and distribution of CDs, audio cassette tapes and vinyl records of popular music by various performers and groups. The entertainment company MCA owns fifty-percent of Interscope. Among the record labels distributed by Interscope is Death Row Records, a company with which Dr. Dre associated less than a year ago.

However, because of an apparent riff between Dr. Dre and other Death Row Records management, Dr. Dre chose to disassociate himself from Death Row Records and instead form his own label, the products of which would be distributed by Interscope along with those under the Death Row Records label. Dr. Dre contends that he chose to separate from Death Row Records because of its notoriety for criminal activity, negative musical themes, and the resulting gang-like turf battles between rappers living on West and East coasts of the continental United States. Indeed, Defendants' evidence shows that Tupac Shakur, a rapper associated with Death Row Records, was recently murdered in Las Vegas, Nevada. While not proven, some in the "rap music world" believe the murder to be a result of a feud between rap artists. Moreover, another rapper associated with Death Row Records, Snoop Doggy Dogg, is a former reputed gang member and convicted felon.

Dr. Dre and Interscope first chose to use the record label name "Black Market." However, for reasons not clear from the record, Dr. Dre and Interscope elected not to embrace the name "Black Market," and, in-

stead, decided to use the name "Aftermath Entertainment." Dr. Dre selected the name "Aftermath" because the word signifies both the discontinuation of his relationship with Death Row Records, and the resulting solo venture by Dr. Dre, i.e., the "aftermath" of his separation with Death Row Records. Thereafter, Dr. Dre and Interscope formed Aftermath Entertainment ("AE"). The exact legal status of AE is currently uncertain, but it is contemplated that AE will be a joint venture.

The severance of Dr. Dre from Death Row Records received widespread media attention. For example, Dr. Dre's appearance on the cover of *Vibe* Magazine, a consumer oriented magazine for black/urban music like rap, was accompanied by the title "Free at Last, Dr. Dre is off Death Row and on a mission to rule the world." Likewise, *BRE*, an industry publication for black radio stations, put Dr. Dre on the cover of its September 1996 issue with the headline "Dr. Dre on his own." The article notes: "Considering the much-publicized goings-on at Dre's old home, the 'Aftermath' moniker alone is poetic." Moreover, the *Los Angeles Times* featured Dr. Dre on the cover of its "Sunday Calendar" section for October 13, 1996.

Prior to investing time and money in promoting AE, Defendants had available to them a detailed Thomson & Thomson Trademark Report, which included information regarding Tsiolis and the Band. The attorney for Dr. Dre and AE telephoned Tsiolis in an attempt to gain his consent for the use of the mark. On various occasions, the attorney spoke with Tsiolis and Tsiolis' brother. The attorney offered five thousand dollars in return for the use of the name "Aftermath" for naming a "small R & B label." The attorney did not disclose to either Tsiolis or his brother the nature and scope of Defendants' proposed Aftermath venture or that the venture involved Dr. Dre. After Tsiolis refused to consent to the use of his registered mark, the attorney offered a recording contract worth approximately twenty thousand dollars which would involve the assignment of the mark to Defendants. Tsiolis perceived the offer as a "sham."

But Defendants did not move on to a third choice for a label name. Instead, notwithstanding Tsiolis' persistent refusal to consent to Interscope's use of the word "Aftermath," Dr. Dre and Interscope moved forward with the establishment and promotion of AE. According to Defendants, AE will be involved in contracting with artists to produce, market and distribute new, up-and-coming artist's musical recordings. In a televised interview with a reporter for Music Television ("MTV"), Dr. Dre stated that, through AE, he intends to produce musical artists from a wide variety of music genres.

The first album to be released on the new AE record label is named "Dr. Dre Presents ... The Aftermath" ("the Album"), which will be released by AE on November 26, 1996. The Album includes a compilation of sixteen different musical "tracks," performed by fifteen solo artists (the artist Sharief performs both "The Intro" and "L.A.W"), including Dr. Dre himself, and two songs performed by multiple rappers and artists. Dr. Dre's desired musical shift is reflected in the first compilation album and his two singles from it. The title of the album captures the fact that this is a new musical period for the artist following his "release" for Death Row. "East Coast, West Coast Killa," the first single, preaches the need to overcome the divisions in rap music, and the video includes artists from both coasts, yet shows his fans he still has "an edge." The song begins by evoking the present hostilities and beckons listeners to move to the "aftermath" of this violent period of infighting, which threatens the viability of the rap genre:

> Gentlemen, we have a problem that has the potential to become a very serious problem. The east coast and west coast separation is exactly the weapon our enemies need to destroy our empire. So what we need to do is bring together some of the biggest, strongest, and smartest forces in the millennium, and this will be the beginning of the Aftermath.

> . . . . . .

> The mighty, mighty Aftermath has now set forth to rise. Indeed.

To reinforce the messages of the video, the word "aftermath" and other terms evoking

the themes of the videos appear scrawled on the background in some scenes.

Defendants created a "promotion plan" to market the Album effectively. The preliminary marketing plan involves the use of promotional materials, including a music video already released to, and played by, MTV, a magazine advertisement placed on the back cover of Billboard Magazine, a poster for display at retail outlets, a bumper sticker, a t-shirt, a trade announcement, a press kit for various media, and a "sniping poster." The "sniping poster" is an adhesive poster with the words "Dr. Dre Presents . . ." at the top of the poster, and the words "The Aftermath" at the bottom of the poster. A large yellow, orange and red mushroom cloud, similar to the "aftermath" of a nuclear explosion, exists in the center of the poster. Tsiolis introduced evidence of such a sniping poster found on a telephone pole in the Wicker Park neighborhood in Chicago, Illinois.

Defendants also intend to publicize the Album in music-oriented magazines and publications of general circulation, such as the *Los Angeles Times, New York Times, U.S.A. Today,* and *Newsweek.* At the current time, Dr. Dre's single, "Been There, Done That" and the song "East Coast/West Coast Killa" are being played on both R & B/urban radio stations and Top 40 stations, neither of which play heavy metal music.

Defendants have already spent approximately $200,000 in the creation, production, and distribution of record covers and marketing materials. While the precise amount Defendants will spend to promote the Album and AE is uncertain, Interscope stipulated that it alone will invest "at least" ten million dollars in the venture and its promotions. Interscope expects to sell 750,000 copies of the album between the release date, November 26, 1996, and December 31, 1996.

### C. Aftermath: The Word

The word "Aftermath," meaning "the period immediately following a usually ruinous event," *Webster's Ninth New Collegiate Dictionary* 63 (ed. 1986), is a popular term in the music industry. Between 1984 and 1994, at least eight different songs bore the title "Aftermath" or "The Aftermath." In 1966, the musical group The Rolling Stones released an album entitled "The Aftermath," of which the public bought over a million copies. The existence of The Rolling Stones album title is of no consequence to the instant action by Tsiolis. Tsiolis did not have a mark in 1966.

### D. The Experts

Tsiolis introduced the testimony of Deena Weinstein ("Weinstein"), a Sociology Professor at DePaul University, who specializes in the study of the sociocultural aspects of rock and popular music. Weinstein testified that she "moonlights" as a reviewer and writer in the music and popular press regarding rock music. She testified that she is familiar with the band Aftermath, having attended and reviewed their performances.

Weinstein opined that the lines separating the various genres of popular music are constantly changing. Weinstein testified that recent musical groups (such as "Rage Against The Machine", "Biohazard," and the "Beastie Boys") combine elements of both rap and metal music; that there are concerts and festivals where groups specializing in these two genres (to the extent that they are still separate and distinct) appear together and that these types of music are marketed in the same outlets and played to the same audiences, particularly on MTV. Moreover, Weinstein testified that there has been a considerable "melding-together" of rap and rock music in recent years. According to Weinstein, in metal music's stage of crystallization in the early 1980's, listeners of heavy metal could distinguish the music from other types of music by a bottom heavy sound, i.e., heavy drum sounds with a blues oriented guitar and singer with a powerful voice. Rap music crystallized in the second half of the 1980's, characterized by a rhythmic, rather than melodic, component and prominent vocal elements that are spoken or chanted rather than sung. However, Weinstein testified that in recent years, there has been considerable "merger" of the types of music and they are much less distinguishable from one another today than there were at crystallization. According to Weinstein, rap and metal music do appeal to basically the same audience, namely, adolescent boys, since both

types of music were at least originally considered to be extreme music and since both are very powerful and energetic.

With respect to the Band, Weinstein testified that although the Band has been relatively successful, there exists the possibility that its full commercial potential has not yet been realized. She stated that the Band has the potential to become more "mainstream" and, thus, attract a greater audience and achieve more widespread success. Weinstein also testified that the name Aftermath is a good name for the Band. According to Weinstein, the name is "apocalyptic" enough to suggest extreme music, but does not tie the band down into any particular genre. The name of the band is important, stated Weinstein, because it is the way that fans know them since fans do not ordinarily know the specific people in the band; if a band changes its name, it could appear to fans that the band is "selling out" and that would hurt its "street credibility" among present and prospective fans.

Defendants introduced the testimony of Fred Bronson ("Bronson"), a Los Angeles writer who has studied and written on the music industry. Bronson has no personal awareness or familiarity either with the band Aftermath or Defendants' Aftermath venture. Bronson testified that while undoubtedly some fans listen to both rap and heavy metal music, the two styles of music are different and have different primary audiences. The primary audience of heavy metal is white, teenage, working-class males; the primary audience of rap is young, urban, black males. Bronson further testified that most heavy metal performers are white males, and most rappers are black males. Tsiolis is a white male; Dr. Dre is a black male. Bronson testified that the two genres of music are typically played on different radio stations and marketed to different consumer types using different media and promotional techniques.

Bronson also opined that the selling feature of a musical recording is not the record label, but the performing artists. Except in rare instances, such as the Motown record label, the record label names are not considered by record consumers when they purchase musical recordings, Bronson testified. Therefore, each record label focuses its marketing activities on promoting and advertising the artist and his or her works, not the record label name. Bronson also testified that it is highly unusual for a band to market its recordings on a label of the same name. Thus, bands and record labels with the same names have co-existed for three decades. Defendants gave twenty examples of the sharing of record labels and band names. For example, Cream was an American label that featured R & B artists, and was also the name of a British rock band that included Eric Clapton. Another example is the name Imperial. There exist five different record labels named Imperial, but the best-known label was founded in 1947, and included artists Fats Domino and Ricky Nelson. The band Little Anthony & the Imperials was an R & B group which recorded on several labels, but never the Imperial label. Yet, the court is mindful that Defendants neglected to inform the court whether any of the above examples involved the registration of service marks.

Defendants also introduced affidavit testimony of Gary Arnold ("Arnold"), Vice President of Marketing for the company Best Buy. Arnold stated that each Best Buy store organizes its record albums by genres and, within each genre, by the name of the artiest. Best Buy stores have separate "rap" and "rock" sections. Best Buy places all heavy metal groups under the "rock" section. Arnold opines that the "trend" of record stores is "toward increased segregation by genre, because record consumers prefer them to be separated." According to Arnold, record consumers purchase music with a specific artist or specific album, not record label, in mind. Arnold further stated that stores such as Best Buy do not decide to purchase records because of their record labels, but because of the popularity of each artist.

Defendants also introduced an affidavit of Irving Azoff ("Azoff"), a noted record label executive, former president of MCA Records, and current co-owner of Giant Records. Azoff, who has signed numerous groups to major labels and managed various well-known artists, opined that similarity of an

artist or band name with a record label has no effect on a record label's decision to sign that artist or group.

### E. The Rest of the Evidence

Shane Bugbee ("Bugbee"), owner of Michael Hunt Publishing Company, testified that he and Tsiolis contemplated and made plans to create a new record label, in addition to Zoid, which would be named "Aftermath Entertainment." Bugbee further testified that he and Tsiolis intended to release a "Best of Aftermath" (the Band) album on the new label. The court observes that Tsiolis offered no evidence in support of these plans and intentions.

Interscope's head of marketing ("Berman") testified that it is of utmost importance for Interscope to release the Album as scheduled. Berman testified that approximately forty percent of all record sales during any year take place during the months of November and December; the release schedule for the Album has been set so that Interscope can exploit the crucial selling season. Berman also testified that if Interscope and Defendants are forced to cease using the "Aftermath Entertainment" title and scramble to maintain their production schedule, they will not only lose their prior investment, but have to spend more than $175,000 additionally to create new marketing materials in a "rushed manner." Being forced to stop using "Aftermath" entirely will delay release of the album for weeks, at a cost of about $1,000,000 per week. Also, significant sums will need to be spent to re-record songs and produce videos that do not include the word "aftermath." Interscope has already spent $1,000,000 for the creation of the music videos.

## II.

A preliminary injunction order is an extraordinary remedy, which the court will enter only in extraordinary circumstances. *Daniels v. Southfort*, 6 F.3d 482, 485 (7th Cir.1993). In order to obtain a preliminary injunction, Tsiolis must demonstrate (1) a likelihood that he will prevail on the merits of his claim for relief, (2) an absence of adequate legal, rather than equitable, remedies, and (3) that he will suffer irreparable harm

without injunctive relief. *Wisconsin Central Ltd. v. Public Serv. Comm'n of Wisc.*, 95 F.3d 1359, 1366 (7th Cir.1996). Should the court find that Tsiolis has established all three above elements, it must then weigh the suggested harm to Tsiolis with the potential injury to Defendants. *Id.*

## III.

### A. Likelihood on the Merits

The court's analyses of Tsiolis' claims for relief, specifically service mark infringement, unfair competition, common law infringement, and deceptive trade practices, are identical. *See* 815 ILCS § 505/1 (deceptive trade practices); *Spex, Inc. v. Joy of Spex*, 847 F.Supp. 567, 579 (N.D.Ill.1994); *Ziebart Int'l Corp. v. After Market Assocs., Inc.*, 802 F.2d 220, 228 (7th Cir.1986). In order to succeed in these claims, Tsiolis must prove that Defendants' use of the mark "Aftermath" is likely to cause confusion among consumers. *Nike, Inc. v. "Just Did It" Ent.*, 6 F.3d 1225, 1227–28 (7th Cir.1993). In order to succeed on the other claim for relief, the dilution claim, Tsiolis must demonstrate a "likelihood of dilution." "The issue[s] of likelihood of confusion [and dilution] [do] not arise, however, until it is determined that the plaintiff has a trademark that the law will protect." *Illinois High School Assoc. v. GTE Vantage Inc.*, 99 F.3d 244, 246 (7th Cir.1996). Therefore, the court will first look to the "protectability" of Tsiolis' mark.

### 1. Classification of Mark

Tsiolis' federal trademark registration for "Aftermath" is *prima facie* evidence of the validity of the mark, and the mark is presumptively valid. 15 U.S.C. § 1115(a). However, it is well-settled that the presumption of validity may be overcome by a showing that the registered mark is either generic, or, in some cases, descriptive. *Henry Heide, Inc. v. George Ziegler Co.*, 354 F.2d 574 (7th Cir.1965). This is because a registered trademark is not a property right or other legal entitlement, like a copyright or a patent, but merely an identifier of source. 15 U.S.C. §§ 1114(1), 1125(a).

Marks are classified into five categories of increasing distinctiveness: 1) generic, 2) descriptive, 3) suggestive, 4) arbitrary, and 5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68, 112 S.Ct. 2753, 2756–57, 120 L.Ed.2d 615 (1992); *Dunn v. Gull*, 990 F.2d 348, 351 (7th Cir.1993). The level of trademark protection available differs within each mark category. "[G]eneric terms receive no trademark protection; descriptive marks are protected only if the mark has achieved 'secondary meaning' in the relevant community; and suggestive, arbitrary, and fanciful marks are deemed inherently distinctive, and thus entitled to full protection." *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996).

As stated above, a generic term—though registered with the USPTO—receives no protection under federal and state trademark law. *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir.1996) ("The trademarking of generic terms would impose excessive costs of information on competitors and consumers and is therefore forbidden"). *See also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992); *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986). Whether a term is generic is a question "of linguistic usage," and the Seventh Circuit sanctions the dictionary as a useful approach. *Pro–Line*, 83 F.3d at 171. If a word appears in a standard dictionary in lower case, "this would be powerful evidence that the term was generic, because nouns and other nominatives listed in dictionaries, save for the occasional proper name, denote kinds rather than specific entities ('dog,' not 'Fido')." *Id.*

On the other hand, descriptive words, such as "bubbly" champagne, are terms that "merely describe the ingredients, qualities, or characteristics of an article of trade or a service." *Mil–Mar*, 75 F.3d at 1157. Descriptive words are protectable marks only if they have acquired secondary meaning; that is, only if the consuming public would think of the word not as descriptive, but as the name of the product (i.e., "Holiday Inn"). "[T]rademarks that are fanciful (i.e., made up, like 'Kodak' or 'Exxon'), arbitrary (e.g., 'Black & White' scotch), or suggestive (e.g.,

'Business Week,' 'Coppertone') are protectable in that the use of the mark would almost certainly cause a likelihood of confusion." *Spraying Sys.*, 975 F.2d at 392.

■ Though neither party argues as such, the court finds that the term "aftermath" is a term undeserving of trademark protection. In so finding, the court notes that in both the *Webster's Ninth New Collegiate Dictionary* (1986) and *Webster's II: New Riverside University Dictionary* (1988), the noun "aftermath" appears entirely in lower-case letters. The term is neither fanciful, arbitrary, nor suggestive. Thus, the only two categories within which the word must fit are the generic and descriptive categories.

■ Whether the term fits into either the generic or descriptive category is a close call, but the court need not make such a determination. Assuming the word "aftermath" is non-generic, and thus descriptive, the word has yet to achieve a "secondary meaning" in the "music world." *Mil–Mar*, 75 F.3d at 1156. Unlike "The Beatles," the mention of the word "aftermath" in the music community neither connotes a specific band, nor automatically conjures up visions of the heavy metal band in which Tsiolis is a member. Therefore, giving Tsiolis the benefit of the doubt that the word "Aftermath" is descriptive, not generic, the court nevertheless finds the word to be undeserved of trademark protection.

### 2. Likelihood of Confusion

■ Had the court not found the term "Aftermath" to be a mere descriptive term, it would have found that no likelihood of consumer confusion would result from the coexistence of the Band "Aftermath," the Album "The Aftermath," and "Aftermath Entertainment." Thus, notwithstanding the outcome in Section III–A–1 of this Order, the court would have denied the motion.

Tsiolis claims that Defendants' activities are likely to cause two separate and distinct forms of confusion. First, Tsiolis contends that if Defendants proceed as planned, members of the consuming public are likely to believe that Tsiolis, the Band, Dr. Dre, Interscope, and AE are all affiliated, or that Tsiol-

is sold his rights to or otherwise endorsed Defendants and the Album. This type of confusion is known as "forward confusion." *Sands, Taylor & Wood Co. v. The Quaker Oats Co.,* 978 F.2d 947, 957 (7th Cir.1996). Second, Tsiolis avers that "reverse confusion" will result from Defendants' massive and widespread promotion of products bearing the name "Aftermath." "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user," thus giving consumers the impression that the smaller, senior user infringed upon the junior user. *Sands,* 978 F.2d at 957. The result: "the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ameritech, Inc. v. American Info. Tech. Corp.,* 811 F.2d 960, 964 (6th Cir.1987).

All claims based on a likelihood of confusion are to be evaluated in light of seven factors: (1) the similarity of the services for which the name is used; (2) the area and manner of concurrent use; (3) the strength of the complainant's mark; (4) the degree of similarity between the marks in appearance and suggestion; (5) the degree of care likely to be exercised by consumers; (6) intent on the part of the alleged infringer to "palm off" its services as those of another; and (7) evidence of actual confusion. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 381 (7th Cir.1996); *Smith Fiberglass Prods. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir. 1993). The court is aware of the Seventh Circuit case which apparently " 'sweeps under the rug' [the] well-established seven-factor test, and instead dwells on [a plaintiff's] failure to produce evidence of actual confusion." *Libman Co. v. Vining Inds., Inc.,* 69 F.3d 1360, 1365 (7th Cir.1995) (Coffey, J., dissenting). However, because more recent Seventh Circuit decisions again look to the seven factors, the court will follow the recent trend, and similarly consider the factors.

The court should consider the seven factors in both "forward confusion" and "reverse" confusion trademark cases. *Sunmark, Inc. v. Ocean Spray Cranberries,* 64 F.3d 1055 (7th Cir.1995). No matter the theory, "forward" or "reverse confusion," no one factor is exclusive, "nor does any one factor end" the inquiry. *Nike,* 6 F.3d at 1228. Of the seven factors, the Seventh Circuit "referred to three of them—similarity of marks, intent of the claimed infringer, and evidence of actual confusion—as 'the more important.' " *Ziebart Intern. Corp. v. After Market Assoc.,* 802 F.2d 220, 226 (7th Cir. 1986). The court finds those three factors, factors (4), (6) and (7), in addition to factors (3) and (5), to weigh clearly in Defendants' favor, and will discuss those five in turn.

### 1. There Is No Evidence of Actual Confusion

Tsiolis introduced no evidence of actual confusion. The court is aware that "actual confusion need not be shown ... since actual confusion is very difficult to prove and the [Lanham] Act requires only a likelihood of confusion as a source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986). However, the court is also aware that, though the Album has not yet been released, great publicity surrounds Defendants' Album, "Dr. Dre Presents ... The Aftermath," as well as the public breakup with Death Row Records, and the formation of "Aftermath Entertainment." Evidence in the form of a poll, survey, or questionnaire would have been highly probative of a likelihood of confusion between the name of the Album, AE, and the Band. Though Tsiolis had the opportunity to produce evidence to suggest that the placement of a few sniper posters in Wicker Park, and the MTV playing of the "East Coast/West Coast Killa" and "Been There, Done That" music videos, caused confusion among the Band's fans, he did not. The nonexistence of such information weighs in favor of Defendants at this early juncture.

### 2. The Appearances and Suggestion of the Two Marks Are Dissimilar

The court must analyze the similarities and differences between the parties' marks in the context in which the consumers encounter them in the marketplace. *Source Servs. Corp. v. Chicagoland JobSource, Inc.,* 643

F.Supp. 1523, 1528–29 (N.D.Ill.1986). Moreover, the court may take into account the differences in presentation and layout. *Sunenblick v. Harrell,* 895 F.Supp. 616, 628–29 (S.D.N.Y.1995); *Green v. G. Heileman Brewing Co.,* 755 F.Supp. 786, 790 (N.D.Ill.1991).

Here, the two logos (the Band's logo and AE's logo) are similar only in that they both include the capitalized word "Aftermath." The Band's logo involves a block letter presentation of the word "Aftermath," while Defendants' AE logo includes a large "A", with the words "Aftermath Entertainment" underneath it. The Band displays its logo prominently on the cover of each album, t-shirt, bumper sticker, and poster. Yet, no matter where the AE logo appears, it is always found in a miniature format, shoved in a corner of the poster, album, or advertisement, and is inconspicuous compared to the name of Dr. Dre. Moreover, AE's logo does not appear alone; it appears with the Interscope logo, and always appears near the name of Dr. Dre. As the United States Court of Appeals for the Seventh Circuit noted in *Ziebart,* 802 F.2d at 227, "Prominent display of different names on the marks has been held to reduce the likelihood of confusion even where . . . the marks are otherwise similar." This concept also applies to Dr. Dre's album title, "Dr. Dre Presents . . . The Aftermath." The First Circuit agrees, "We and other courts have indicated that in certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981). In accordance with the above case law and directives, the court finds that the marks, while similar in words, are different not only in appearance, but in presentation and layout. This factor, thus, weighs in favor of Defendants.

### 3. Defendants Do Not Intend to "Palm Off" Their Product

"[P]roof of intentional copying" steers a court toward a finding of likelihood of confusion. *Henri's Food Prods. Co. v. Kraft, Inc.,* 717 F.2d 352, 354 (7th Cir.1983). Yet, the court finds the record devoid of any evidence of such intent. Without such evidence, the court finds unreasonable Tsiolis' contention that Defendants intend to use the good name of his mark. This argument is irrational upon consideration of the massive prior successes of all Defendants in the music industry, including Dr. Dre's noted work as an artist and producer. Given the limited recognition of Tsiolis' part-time venture, there is no evidence of any intent by Defendants to "palm off" their services as those of Tsiolis.

Instead, the court finds that Dr. Dre thought of the name "Aftermath" before he had ever learned of the Band's existence. The intent of Dr. Dre was not to "steal" from Tsiolis, but to utilize a word which the public will connect with his well-publicized breakup with Death Row Records.

Tsiolis apparently argues that the alleged "sham" negotiations between Defendants' attorney and he and his brother are evidence of Defendants' bad faith in attempting to utilize an already-famous mark. Yet, the court finds that the communications between the parties prior to Tsiolis filing the instant Complaint were not made in bad faith, but in an attempt to bypass the expense and burden associated with federal litigation. This court agrees with that of the Eastern District of Wisconsin,

> [T]his Court is of the view that a party should not be penalized for attempting to settle before litigation, any differences between himself and a potential protagonist. . . . Negotiation before litigation is favored by the courts and should not be deemed to evince a weakness of claim or position and a party to subsequent litigation should not be disadvantaged thereby. Without more, little weight should be afforded prelitigation negotiation as a factor indicating any bad faith on the part of [Defendants].

*S.C. Johnson & Son, Inc. v. Lever Brothers Co.,* 19 U.S.P.Q.2d 1027, 1037, 1991 WL 217665 (E.D.Wis.1991). *See also, Galaxy Chemical Co. v. BASF Corp.,* 11 U.S.P.Q.2d 1279, 1283, 1989 WL 31043 (N.D.Ill.1989), *aff'd,* 24 U.S.P.Q.2d 1238, 1992 WL 165967 (7th Cir.1992) ("The fact that BASF attempt-

ed to obtain GCC's consent and when the consent was not forthcoming, went ahead and marketed the 'Galaxy' soybean herbicide, a product distinct from GCC's line, does not without more prove infringing intent.").

Because there is no evidence of an intent to "ride" on the success of Tsiolis' mark, this factor weighs in favor of Defendants, as do the first two of the three "more important" factors of likelihood of confusion between marks. Yet, while these three alone may justify a denial of Tsiolis' motion, the court finds that two additional factors also weigh in Defendants' favor.

### 4. The "Aftermath" Mark Is Weak

"The strength or weakness of a trademark will define the scope of protection to be accorded the mark against confusing similarity of other marks. The weaker the mark, the less the likelihood of ·confusion, and therefore the more limited the protection available." *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551, 556–57 (N.D.Ill.1984). In other words, "[i]f the mark is weak, its protection may have an 'extremely narrow scope.'" *Spex,* 847 F.Supp. at 576. The registration of a mark is not itself evidence of mark strength; rather, strength is created by the extensive use and significant expenditure of a mark holder on advertising and promotion. *Echo Travel, Inc. v. Travel Assoc., Inc.,* 870 F.2d 1264 (7th Cir.1989).

The court finds that, though Tsiolis' perseverance, dedication and commitment to the Band and its music are praiseworthy, the strength of his mark remains weak. Tsiolis spent relatively little time and money on his "use" of the mark. He performed before a public audience infrequently, sold only a small amount of albums per year, and earned little revenue from participation in the Band. While the court does not characterize the Band as an "underground" band, the court finds the band to· be one of only limited, primarily-local recognition, which is restricted to the "heavy metal music world."

In so finding, the court acknowledges Weinstein's testimony, and gives weight to her opinion that a new "hybrid" form of music, a combination of rap lyrics and heavy metal music, is "coming into existence." Moreover, the court is mindful of her testimony that both genres of music have similar audiences. But Tsiolis provided the court with no evidence that the Band is among the "mergers"; to the contrary, Tsiolis' occasional performances have been mainly at "metal fests" and similar festivals promoting solely heavy metal music. Tsiolis admits that the Band has not performed at all in 1996. Media reviews of the Band, as well as interviews with Tsiolis himself, make clear that it plays heavy metal music, and no other type of music. The popularity of the Band "Aftermath" is narrow, and the scope of the trademark protection must be limited so as to be commensurate with the confined popularity. Thus, the. court finds that the protection should be confined to the heavy metal music field in a restricted area, and does not extend to other genres of music.

Defendants' use of the mark does not interfere with the highly restricted scope of protection afforded Tsiolis' mark. Defendants' markets are wholly different from those of Tsiolis and the Band. Defendants will spend millions to promote the Album and AE both nationally and internationally in record stores aimed at the mainstream public. The market in which Dr. Dre, the Album, and AE will permeate is far-reaching. Dr. Dre is a musician with worldwide fame and recognition, and his breakup with Death Row Records only increased the public's awareness ·of him and his new Album. In short, Defendants' markets are "far removed from those of the trademark holder [Tsiolis]." *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 164 (S.D.N.Y. 1980). Dr. Dre's product, marketing, and consumers, are dissimilar to those of Tsiolis. Thus, the protections afforded the trademark do not interfere with Dr. Dre's use of the word "Aftermath." Because the weak strength of Tsiolis' mark affords the mark very narrow, limited protection, the court finds this factor to weigh in Defendants' favor, as well.

### 5. Consumers Are Likely to Use a High Degree of Care

In determining the degree of care that will be exercised by consumers, courts analyze

the nature of the purchasing decision. *Imperial Serv. Sys, Inc. v. ISS Int'l Serv. Sys., Inc.*, 701 F.Supp. 655, 659 (N.D.Ill.1988). Tsiolis argues that because CDs and cassette tapes are relatively inexpensive, a casual purchaser buys a CD or tape without careful consideration and, thus, there is a greater potential for confusion. *See Pump, Inc. v. Collins Mgmt., Inc.*, 746 F.Supp. 1159, 1169 n. 15 (D.Mass.1990). However, upon review of the record, the court finds no support in the evidence for his opinion.

Here, customers are motivated to purchase recordings based upon the performer, not the record label. *Sunenblick*, 895 F.Supp. at 634. Consumers also are "necessarily discriminating" between musical genres. *Id.* Thus, in attending Tsiolis' concerts and purchasing the Band's albums, reasonable consumers will exercise care to insure that the concert or recording features the artist they seek before spending their money. *Id.*

Defendants introduced evidence that the albums of different musical genres are separated in several stores. Within each musical genre, the retail stores alphabetize each album by artist. Specifically, the Band's album will be alphabetized in the "A" subsection of the "rock" section. Each artist signed by AE will be alphabetized using the first letter of their last name, or first name of a group, and will be found in the "rap" section. With regard to the Album, "Dr. Dre Presents ... The Aftermath," the consuming public will find it in the "D" subsection of the "rap" section. Thus, even the most inattentive and careless prospective purchaser of the Band's works will be hard-pressed to "accidently" purchase the albums of artists that are produced by the AE record label.

Therefore, this factor, as well as the three "more important" factors, and another factor, all weigh in favor of Defendants. These five factors compel the court to find that Defendants' use of the word "Aftermath" in the Album title and its record label has not caused, and will not cause in the future, a likelihood of confusion between Defendants and Tsiolis' Band. Therefore, with regard to the service mark infringement, unfair competition, common law infringement, and deceptive trade practices claims, the court finds

that Tsiolis has not shown that he will likely succeed on the merits and, accordingly, denies the motion as it relates to those four claims for relief.

*3. Likelihood of Dilution*

■ The only claim that requires a discussion other than the likelihood of confusion is the dilution claim, brought pursuant to the Illinois Anti–Dilution Statute. Dilution does not require a showing of likelihood of consumer confusion and, thus, is understood by trademark scholars to provide greater protection for trademark owners. *See* Shire, *Dilution Versus Deception—Are State Antidilution Laws an Appropriate Alternative to the Law of Infringement?*, 77 *Trademark Rep.* 273 (1987). To succeed on a dilution claim under the Illinois statute, Tsiolis must demonstrate that his mark is distinctive and that Defendants' use of the same or similar mark dilutes that distinctiveness. *Eveready Battery Co., Inc. v. Adolph Coors Co.*, 765 F.Supp. 440, 451 (N.D.Ill.1991). "The statute protects only strong, distinctive marks with widespread recognition." *Sunmark, Inc. v. Ocean Spray Cranberries*, 64 F.3d 1055, 1060 (7th Cir.1995). As discussed above, the trademark "Aftermath" is not so "distinct" as to warrant dilution protection. The mark is weak, does not have its origin with Tsiolis, and has not "acquired a widespread reputation." *Tower Pubs., Inc. v. MTS Inc.*, 21 U.S.P.Q.2d 1303, 1306, 1991 WL 222265 (N.D.Ill.1991). Accordingly, the court finds that, at this early stage and on this limited record, Tsiolis is not likely to prevail on the state law dilution claim.

*B. Adequacy of Legal Remedy and Irreparable Harm*

■ But for the above discussion, the court would still have found in favor of Defendants and against Tsiolis. Assuming the court found a likelihood that Tsiolis would have prevailed on the substantive counts— which the court did not—Tsiolis' failure to demonstrate a resulting irreparable harm dooms his motion.

Tsiolis bears the burden of demonstrating immediate irreparable harm. Tsiolis argues that if the court does not enter a preliminary

injunction order, his mark will then be appropriated, thus rendering his Band "unable to compete in the face of Defendants' success." While Tsiolis' delay in bringing the instant action is excusable, and does not warrant denial of the motion, the absence of an irreparable harm demonstration is not. The court is aware of the decade of effort Tsiolis expended in promoting the Band and its music. However, the court finds that a jury can provide damages sufficient to remedy any injuries incurred by Tsiolis as a result of Defendants' release of the Album. This trial will begin only fourteen days after the Album reaches retail stores, and the damage done by the fourteen days of sales is of the type compensable by a jury damages award. The court is aware that the Complaint includes a request for permanent injunctive relief.

### C. Balancing The Equities

█ Notwithstanding the above discussion, had the court found that Tsiolis established the three requisite elements for a preliminary injunction, it nonetheless would have denied the motion *sub judice*. The court finds that the harm to the Defendants in delaying the sale of the Album until after trial far outweighs the potential harm to Tsiolis. Defendants intend to release the Album for the Christmas sales season. Defendants have already spent over one million dollars recording, producing, and marketing the Album and AE, an amount far exceeding the total ten-year investment made by Tsiolis and the record distributors with which he contracted to promote "Eyes of Tomorrow." Therefore, the court would still have denied the motion, since the improvident entry of such an injunction would cause damages far exceeding those suffered by Tsiolis.

### D. Substantial Bond Amount

Had the court entered the injunction, it would have been compelled by Federal Rule of Civil Procedure 65(c) and Seventh Circuit precedent to set a bond amount commensurate with "such costs and damages as may be incurred or suffered" by Defendants if the court's injunction was reversed by a superior federal court. Fed.R.Civ.P. 65(c); *Coyne–Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 391 (7th Cir.1983). It is well-known, well-established, and oft-discussed that the bond places a ceiling on the damages that Defendants could obtain for the wrongful grant of an injunction, absent a showing that the Tsiolis acted in bad faith. *See Board of Educ. of Oak Park & River Forest High School Dist. 200 v. Illinois St. Bd. of Educ.*, 79 F.3d 654, 659 (7th Cir.1996). Thus, the court's focus in determining the bond amount should be on the amount necessary to make Defendants whole if its injunction order was erroneous. *Glenwood Bridge, Inc. v. Minneapolis*, 940 F.2d 367, 373 (8th Cir.1991).

Defendants introduced evidence that a court-ordered injunction would put at risk approximately $400,000 of investments prior to the release date, and the damages would equal one million dollars per week of delay after November 26, 1996. . Thus, had the court not denied the instant motion, it would have been compelled to set the injunction bond in a substantial dollar amount, an amount Tsiolis likely would not be able to pay. Scant business records, if any, at the hearing and the testimony of the Band's business manager do not augur well to establish the ability of Tsiolis to post the bond. Anything less would provide only slight and minuscule recompense for an erroneously-entered injunction order. But the bond amount issue is not before the court and, thus, need not be considered or decided by the court.

### IV.

In conclusion, the court denies Tsiolis' motion and, instead, sets the matter for an expedited trial. Keeping in mind that an injunction entered before a trial on the merits is an extraordinary, and extreme remedy, the court finds that Tsiolis has not shown that he is likely to prevail on either of the "forward" and "reverse confusion" theories. He has not shown that the public, and the Band's fans, will believe that Tsiolis and the Band are affiliated with Defendants or that Tsiolis sold his rights to endorse Defendants and the Album. Moreover, given the narrow protection afforded Tsiolis' mark, it is unlikely that the popularity of Defendants' AE venture and promotion of the Album will result in Tsiolis losing all value of his mark in the Chicagoland area.

The court is mindful that this Order may result in harm to Tsiolis' vague plans to

promote a new album and his efforts towards global domination. But the harm is slight compared to the potential harm to Defendants who are well along with their immediate concrete plans. The court disagrees with Tsiolis that this Order, allowing Dr. Dre and other Defendants to go forward with the promotion of the AE venture and the "Dr. Dre Presents ... The Aftermath" Album, will force Tsiolis to change the Band name. The evidence in the record shows that it is not uncommon for bands, record labels, album names, and song titles, to share a common word or phrase. But the court reminds Tsiolis that this Order determines merely that he failed to meet the burden of showing that such an extraordinary and extreme remedy is warranted prior to a trial on the merits. The court expresses no opinion on the eventual merit of Tsiolis' case at trial.

Likelihood of confusion is frequently a disputed issue upon which reasonable minds may differ. *Nike, Inc. v. "Just Did It" Ents.*, 6 F.3d at 1229. Absent unusual circumstances or a settlement between the parties, a jury of "reasonable minds" will decide the merits of Tsiolis' case on December 10, 1996. Tsiolis will have his day in court, and Defendants will have their day in retail stores worldwide in the interim.

IT IS SO ORDERED.