OPINION OF THE COURT
Ira Gammerman, J.
Consolidated here for determination are two motions: (1) plaintiff’s motion for a preliminary injunction, along with defendant Sony Music Entertainment, Inc.’s (Sony) cross motion for the imposition of sanctions and costs; and (2) Sony’s motion for an order dismissing the complaint as to it and for sanctions and costs.
Plaintiff Ted Poley (Paley) is a musician who, along with defendants Steve Berlow, also known as Steve West (West), and Bruno Dicecco, also known as Bruno Ravel (Ravel), and nonparty Casey Schmitt (Schmitt) signed a recording contract with Sony’s predecessor-in-interest CBS Records in March of 1988 (the Contract) as performers in the music group known as "Danger Danger”.
Pursuant to the 1988 Contract Sony advanced funds to the group to allow it to make a master recording to be released by Sony as an album. Advances made for the making of the master recording, and the promotion of the album and the group through music videos, tours and personal appearances, were to be recouped by Sony from royalties earned from the sale of the album.
Danger Danger delivered its first master recording to Sony in late 1988 or early 1989, and the first album (the First Album) was released by Sony in 1989. In the complaint it is alleged that the First Album was heavily promoted by Sony *130 and sold well. Poley and the rest of the group made tours of the United States, Canada and Japan. Poley performed as lead vocalist and also provided background vocals on the First Album.
A second album (the Second Album) was delivered to Sony in May 1991, and was released by Sony. Again, the group toured extensively but, it is alleged, Sony failed to promote the Second Album in the same manner as the First, and sales of the Second Album did not reflect the promise of the First Album.
The dispute embodied in the present action primarily involves the third master recording produced by Danger Danger. Despite the Second Album’s allegedly poor showing, Sony exercised its option for a third album, which was delivered to Sony in August 1993, again featuring the lead and background vocals of Poley.
Plaintiff alleges that Sony was enthusiastic about the third master recording and anticipated its success with a celebratory dinner, promising to give the third album (the Third Album) "full monetary and promotional support.”
Before the Third Album could be released trouble erupted within the group, which by this time consisted only of Poley, Ravel and West, Schmitt having previously been "disassociated” as a member of Danger Danger. Ravel and West informed Sony that Poley was also to be "disassociated,” and replaced by a new member. Sony returned the master recording of the Third Album to the remaining group members, who proceeded to re-record the album, replacing Poley’s vocals with those of a new band member. The re-recorded master recording was then returned to Sony. As of this time, Sony has released neither the original Third Album nor the rerecorded version, and insists that it has no immediate plans to issue either version.
the motions:
Plaintiff seeks to preliminarily enjoin the release by Sony of the re-recorded Third Album, claiming that his reputation as a professional musician, and his earning power, will be irreparably harmed if a version of the album is released which contains the vocals of another singer. Sony cross-moves for the imposition of sanctions against Poley for proceeding with this allegedly frivolous motion even though plaintiff was allegedly informed that the issue was moot because of Sony’s decision *131 not to release the re-recorded (or the original). Third Album. Sony maintains that this decision means that there is no threat of imminent harm to Poley. Further grounds for denial of an injunction are alleged in Sony’s motion for dismissal of the complaint based on documentary evidence and failure to state a cause of action.
motion to dismiss:
In a motion to dismiss for failure to state a cause of action the pleading must be construed in the light most favorable to the nonmoving party, and all the factual allegations therein deemed to be true (Penato v George, 52 AD2d 939, 941, appeal dismissed 42 NY2d 908). The motion will be denied if the motion papers establish that the plaintiff has any chance of recovery (supra). A motion for dismissal based on documentary evidence will succeed only if the documents submitted resolve all of the factual issues as a matter of law (Gephardt v Morgan Guar. Trust Co., 191 AD2d 229, Iv denied 82 NY2d 656).
In plaintiff’s first, second and tenth causes of action Poley seeks an accounting of the royalties earned on the First, Second and Third Albums, respectively.
Dismissal of the plaintiff’s first, second and tenth causes of action is required because plaintiff has failed to allege any grounds for a contractual or equitable right to an accounting. Under the terms of the Contract, Poley is entitled to receive semiannual statements of royalties earned (which he does not deny receiving) and is allowed to have a certified public accountant review the books kept by Sony concerning Poley’s royalties (which Poley has not done). Poley’s contention that he does not understand the statements he has received does not create a contractual right to an accounting. Nor does his relationship with Sony amount to the type of fiduciary or confidential relationship which may create a right to an equitable accounting (see, PVM Oil Futures v Banque Paribas, 161 AD2d 220).[1]
Poley’s third and fifth causes of action allege Sony’s breach of contract in failing to release the Third Album and in failing to promote it in accordance with the Contract.
*132 In support of his causes of action for breach of contract, Poley argues that the "object and intent” of the Contract was the production and sale of records, with concomitant benefit to Poley and the other band members in the form of royalties. Sony, it is claimed, was obligated, both explicitly and implicitly, to release and promote the albums provided to it by the band in order for Poley, and the other signatories to the Contract, to receive the benefit of the agreement. Alternatively, Poley argues that if the Contract did not explicitly or implicitly require Sony to release and promote the Third Album, the conduct of the parties in the recording, release and promotion of the first two albums caused the Contract to be modified so as to require a similar treatment for the third.
Sony predicates dismissal of the contract-based causes of action upon provisions contained in the 1988 Contract which give Sony exclusive ownership and control of all the recordings made by Danger Danger and which limit Poley’s remedies upon Sony’s decision not to release any album to termination of the Contract. Section 7.01 of the Contract states in pertinent part: "All Master Recordings made or furnished to CBS by you or the Artist under this agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of CBS, free from any claims by you or any other Person; and CBS shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world.” Section 8.05 states:
"Provided you have fulfilled all your obligations under this agreement:
"(a) CBS will release each Album recorded in fulfillment of your Minimum Recording Commitment in the United States within three months after the date of completion of the lacquer, copper, or equivalent masters used in manufacturing the disc units of the Album concerned. If CBS fails to do so you may notify CBS, within fifteen (15) days after the end of the three-month period concerned, that you intend to terminate the term of this agreement unless CBS releases the Album within sixty (60) days after CBS’ receipt of your notice (the 'cure period’). If CBS fails to release the Album before the end of the cure period you may terminate the term of this agreement by giving CBS notice within thirty (30) days after the end of the cure period. On receipt by CBS of your termina *133 tian notice the term of this agreement will end and all parties will be deemed to have fulfilled all of their obligations under it except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties). Your only remedy for failure by CBS to release an Album will be termination in accordance with this paragraph. If you fail to give CBS either of those notices within the period specified, your right to terminate will lapse.”
As plaintiff points out, section 8.05 of the Contract does state, expressly, that Sony "will” release each album recorded by Danger Danger, so that release of the Third Album is apparently mandatory pursuant to the explicit contract provision. However, the Contract also explicitly limits Poley’s recourse upon Sony’s failure to release an album.
Poley attempts to explain away this provision by claiming, without elaboration or citation to authority, that the provision would render the Contract illusory, because it would, allegedly, rob plaintiff of any hope of receiving any benefit under the Contract. Citing to the case of Wood v Duff-Gordon (222 NY 88 [1917]) in which Justice Cardozo propounded the theory that a promise may be lacking in an agreement, yet the agreement nevertheless "may be 'instinct with an obligation,’ imperfectly expressed” (supra, at 91, quoting McCall Co. v Wright, 133 App Div 62). Poley maintains that the obligation to release and promote the Third Album so as to ensure a benefit to himself is implicit in the Contract despite the limitation of his remedies expressed in section 8.05.
It has been said that the party asserting the existence of an implied-in-fact covenant bears a heavy burden, "for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists” (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69). Consequently, the party advancing such a claim "must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole” (supra).
A major flaw in plaintiff’s reasoning is his insistence that the Contract requires his performance, but allows for no detriment to Sony should it decide not to release any album provided by the group. This argument ignores the fact that Sony was required to, and apparently did provide substantial funds, in the form of advances, to Danger Danger so as to *134 afford the group the opportunity to make albums. The Contract is not rendered "illusory” merely because Poley’s remedies against Sony are limited. His benefit was to come not from assured royalties (the Contract contains no such assurances), but from the opportunity to make albums, an opportunity which Poley would not probably have had otherwise. Complaints of unequal bargaining power, and implicit contractual rights should not serve to alter the clear language of the Contract giving ownership of Poley’s finished product to Sony, and limiting his recourse should that product remain in Sony’s possession, unreleased. Poley’s right to have the Third Album released and promoted, or to obtain contract damages as a result of Sony’s decision not to release the recording, is not implicit in the Contract. This reading of the clear and unambiguous contract language remakes rather than clarifies, or completes the Contract as written. Poley’s alleged understanding of his rights under the Contract would provide him with rights and benefits far beyond the contract language, and so is not reasonable nor justified (see, Rowe v Great Atl. & Pac. Tea Co., supra, at 69, citing 5 Williston, Contracts § 1293, at 3682 [rev ed 1937] [" 'the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included’ ”]). Therefore, under the terms of the Contract, Poley has no claim for breach of contract based on Sony’s failure to release and promote the Third Album.
Nor have facts been alleged which would support plaintiff’s claim that the Contract was modified to require the release and promotion of the Third Album as a result of the release and promotion of the first two albums or the behavior of Sony executives at a celebration dinner. The merger clause contained in the Contract, along with General Obligations Law § 15-301, prohibit oral modification of the written agreement (see, Backer v Lewit, 180 AD2d 134). Nothing in the Contract links the release and promotion of any one album with the release and promotion of the next, and plaintiff’s "expectations” to the contrary are not grounds for finding a modification based on the parties’ conduct.
Dismissal of the third and fifth causes of action requires dismissal also of the sixth cause of action, brought to compel Sony to "specifically perform” the Contract by releasing the Third Album. As evidenced by the contract language limiting plaintiff’s remedies, Sony had no such obligation to specifically perform.
*135 Plaintiffs fourth cause of action alleges that Sony breached the Contract by failing to "properly and adequately promote sales of the Second Album in the manner in which Sony previously promoted sales of the First Album.”[2] This cause of action differs from the breach of contract claims in the third and fifth causes of action in that Sony did choose to release the Second Album. The question raised is whether the Contract obligates Sony, upon release of an album, to promote the album at all, or in any particular way.
Sony argues that plaintiff has failed to cite any contractual provision requiring Sony to promote albums, and calls for dismissal as a result of this failure (see, Chrysler Capital Corp. v Hilltop Egg Farms, 129 AD2d 927, 928 [in an action for breach of contract the complaint must set forth the terms of the agreement upon which liability is predicated]).
It is in this cause of action that the concept of an implicit promise has some validity. It is true that the Contract does not expressly require Sony to promote an album it chose to release. However, in light of the numerous provisions setting forth plaintiffs right to royalties from the sale of albums, after repayment of advances to Sony, the Contract implicitly contains an expectation that Sony, totally in control of the sale of the recordings, will promote the sale of the albums released so as to give meaning to the royalties provisions. Once Sony undertook to release (i.e., sell) the Second Album, it implicitly undertook to do so using reasonable efforts to promote the album (see, Contemporary Mission v Famous Music Corp., 557 F2d 918). The fact that the contract in Contemporary Mission contains some reference to the recording company’s obligation to spend a certain amount to promote the recordings which it sold, where the present contract does not, in no way negates that both contracts imply a promise to make reasonable efforts to promote the sale of the recordings at issue. The Contract is " 'instinct with an obligation’ ” on Sony’s part, having chosen to release and sell the Second Album, to do so in a reasonable manner (see, Wood v Duff-Gordon, supra). Thus, assuming the truth of the plaintiffs allegations, the fourth cause of action pleads a cause of action for breach of contract because of Sony’s alleged failure to "properly and adequately” promote the Second Album.
*136 Plaintiffs seventh cause of action for damages based on the Contract’s alleged "unconscionability” is invalid on its face, since the doctrine of unconscionability is not available as a basis for an affirmative recovery, but is intended as a means to avoid enforcement of a contract (Super Glue Corp. v Avis Rent A Car Sys., 132 AD2d 604, 606), a result plaintiff clearly is not seeking. The seventh cause of action must therefore be dismissed.
The eighth and ninth causes of action, the last alleged against Sony, seek, respectively, injunctive relief and damages arising from Sony’s alleged intention to release the re-recorded version of the Third Album in which Poley’s vocals have been eliminated. Plaintiff contends that Sony had no right to allow the band to re-record the Third Album, and breached the Contract’s implied covenant of good faith and fair dealing by frustrating Poley’s ability to perform under the Contract.
Sony maintains that it has the express right to release the re-recorded Third Album containing the vocal performance of a new band member under section 20.02 of the Contract which reads:
"If any member of the Artist ('leaving member’) ceases to perform as a member of the group:
"(a) (1) You will notify CBS promptly and the leaving member will be replaced by a new member, if you and CBS so agree. The new member will be deemed substituted as a party to this agreement in the place of the leaving member and you will cause the new member to execute and deliver to CBS such instruments as CBS, in its judgment, may require to accomplish that substitution * * * You will not permit any musician to perform in place of the leaving member in making Recordings under this agreement, unless that musician has executed and delivered to CBS the substitution instruments referred to in the second sentence of this clause (1).”
Under the provisions of a partnership agreement entered into in 1991 to control the business of the band, Ravel, West, Poley and Schmitt agreed that the name "Danger Danger” belonged exclusively to Ravel and West, and that, under section 12 (a) (iii) of that agreement a partner could be "disassociated” from the partnership by reason of the unanimous vote of all the other partners. Since Poley was "disassociated” from the partnership in 1993 upon the unanimous vote of the remaining partners, Sony claims Poley was a "leaving member” who had ceased to perform as a member of *137 the group under section 20.02 of the Contract, permitting Sony, on notice from the remaining members, to agree to a substitution and continue dealing with the newly configured band.
Poley raises the unconvincing argument that his disassociation from a partnership created to operate the business of Danger Danger does not amount to disassociation from the band itself, from which, allegedly, no one had the right to remove him. Poley contends that Sony was still required to deal with him, and give him the benefits of Contract as a current band member even after his disassociation from the partnership.
The contractual provision concerning "leaving members” of the band is sufficient to refute plaintiff’s argument even without recourse to the partnership agreement. Poley, while maintaining that he is yet a member of the band, does not deny that he has ceased to "perform as a member” thus giving rise to Sony’s right to deal with a substitute. It is irrelevant that he has ceased to perform involuntarily (see, Larkin v Polygram Records, 1986 WL 6174, 3 [SD NY, May 23, 1986, Sweet, J., 86 Civ 1128] ["leaving member” provision in recording contract which applies, inter alla, to a member who "no longer performs with the group” does not apply only to voluntary substitution of performers]). Thus, whether Poley is still a "member” of the group in some sense does not alter the fact that he is no longer performing as a member, and so subject to substitution under section 20.02.
Because the Contract provides expressly for the events which occurred leading to the re-recording of the Third Album, plaintiff cannot claim that Sony breached an implied covenant of good faith and fair dealing by permitting the rerecording. This covenant, implied, under New York law in all contracts, is breached only when one party to a contract seeks to prevent performance by or to withhold its benefits from another (Collard v Incorporated Vil. of Flower Hill, 75 AD2d 631, 632, affd 52 NY2d 594). In light of Sony’s ownership of the recordings of Danger Danger, and its rights to accept the band minus any signatory to the Contract, Sony did not act to prevent Poley’s performance or frustrate his right to benefits. The eighth and ninth causes of action are dismissed.
THE MOTION FOR INJUNCTIVE RELIEF:
Sony opposes Poley’s motion for an injunction barring the *138 release of the re-recorded Third Album both because of the lack of merit in the pleadings and because of Sony’s assurances that it does not plan to release the album, which allegedly negates any possibility of imminent irreparable harm. Obviously, the motion for an injunction must be denied, given the dismissal of the cause of action upon which it is based.
MOTIONS FOR SANCTIONS:
Sony seeks sanctions pursuant to 22 NYCRR 130-1.1 (c) (1) both for the bringing of the action, and for the making of the action, and for the making of the motion for injunctive relief, as well as costs and attorney’s fees under CPLR 8201 and 8303-a.
I do not believe that the motion for an injunction was rendered frivolous merely because Sony had declared its present intentions not to release the re-recorded Third Album. Without a written agreement or judicial order Sony could, with impunity, change its mind. A party should not have to bear such a risk, believing itself in danger of irreparable harm. Preliminary injunctions have been granted even in cases where the enjoined party gave the court assurances that the action sought to be enjoined would not take place (see, e.g., Liberty Cable Co. v Roofcom Assocs., NYLJ, Apr. 29, 1994, at 28, col 2).
Actions and motions are considered frivolous if they are "completely without merit in law or fact and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law” (22 NYCRR 130-1.1 [c] [1]). Plaintiffs reliance on arguments concerning implied, rather than express contractual covenants, though unavailing, are not so completely without merit as to warrant sanctions.
Accordingly, the motions are determined as follows:
(1) the motion for an injunction is denied and the cross motion for sanctions is denied;
(2) the motion for an order dismissing the complaint and for sanctions is granted only to the extent that the first, second, third, fifth, sixth, seventh, eighth and ninth causes of action are dismissed, and is otherwise denied.

. Since the Third Album has not been released Poley’s tenth cause of action for an accounting of sales of the Third Album would be dismissed as premature even if plaintiffs right to an accounting had otherwise been established.

. This allegation is somewhat at odds with Poley’s demand, made in the seventh cause of action for release and promotion of the Third Album "in the same manner that Sony released and promoted sales of the First and Second Album.”