Barbara **MONTGOMERY**, as Personal Representative of the Estate of Her Deceased Husband, Harold Edward Montgomery Appellant

v.

John Michael **MONTGOMERY**, Atlantic Records Corporation, and Maureen Ryan Appellees

No. 1999–SC–1111–DG.

Supreme Court of Kentucky.

Nov. 21, 2001.

William M. Thompson, David A. Tapp, 117 W. Mt. Vernon Street, Somerset, Counsel for Appellant.

Brent L. Caldwell, Jon A. Woodall, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Lexington, Counsel for Appellees.

JOHNSTONE, Justice.

Barbara Montgomery, as personal representative of the estate of Harold Edward

Montgomery, brought suit against John Michael Montgomery, Harold's son. In the suit, Barbara claimed that John Michael had violated Harold's common-law and statutory right of publicity by using Harold's voice and likeness in a music video. The trial court granted summary judgment in John Michael's favor. The Court of Appeals affirmed. We conclude that the right of publicity does not apply in this case and, therefore, affirm.

## FACTS

Harold E. Montgomery was a musician in and around Garrard County in Central Kentucky. He wrote several songs that were recorded in small recording studios. Harold performed alone and with other musicians over a period of years at festivals in his local area. While he rarely appeared outside the Commonwealth of Kentucky, he did twice venture to Nashville, Tennessee, where he recorded a song entitled, "Let Me Be Young Again," and appeared on a local television show.

John Michael Montgomery, Harold's son by Harold's first wife, is a nationally-known country music star. With Harold's encouragement, John Michael took an early interest in country music. The two formed an extraordinary bond.

Harold married Barbara Rogers in 1988. About the same time, John Michael began to rise to the apex of country music, both in song writing and performance. While his fame and success eclipsed his father's, apparently his efforts at achieving it did not. By all accounts, Harold passionately pursued his music career, but never made it to the top. It was through his son that Harold realized his dreams of stardom.

Harold was diagnosed with cancer in 1993 and died in 1994. Barbara was the sole beneficiary of his estate under his will and was named as executrix thereof. She settled the estate informally and expeditiously.

In February 1997, John Michael released his fourth album, which contains the song entitled, "I Miss You a Little." The song is a tribute to Harold. Additionally, a music video of the song was released shortly afterwards. The video lies at the center of the controversy in this case. As found by the trial court, the music video is four minutes and twenty-seven seconds (4:27) long and Harold Montgomery's "likeness" appears in approximately thirty (30) seconds of the video as follows: (1) Harold is heard singing, "Let Me Be Young Again"; (2) Harold's gravestone appears; (3) a forty-five rpm record of "Let Me Be Young Again" bearing Harold's name appears; (4) a picture of Harold and John Michael performing together appears; (5) an article headed "John Michael is living out his father's dream" appears; (6) a picture of Harold performing appears; (7) Harold's gravestone appears a second time; (8) a second picture of John Michael and Harold performing together appears; and (9) the closing dedication states, "This song is written in memory of my father, Harold E. Montgomery." John Michael did not get permission from his father's estate to reproduce Harold's images or vocalizations contained in the music video.

The music video first aired nationally on or about March 3, 1997. Thereafter, Barbara, as executrix of Harold Montgomery's estate, filed suit claiming among other allegations that the use of Harold's likeness in the video violated his estate's common-law and statutory right of publicity.

The trial court granted summary judgment in the defendants' favor on October 5, 1998. In so doing, the trial court found in pertinent part that the common-law right of publicity is not inheritable and that Harold was not a "public figure" with-

in the meaning of KRS 391.170. Specifically, the trial court concluded that a "public figure" was a person who had attained "national celebrity status" within his lifetime.

The Court of Appeals affirmed the trial court's finding that the common-law right of publicity is not inheritable. But instead of examining whether there is a common-law right of publicity that is distinct from the common-law right of privacy established by this Court in *McCall v. Courier–Journal & Louisville Times*,[1] the Court of Appeals assumed that the right of publicity was subsumed in the appropriation prong of the right of privacy, which provides: "The right of privacy is invaded by . . . appropriation of the other's name or likeness. . . ."[2] The Court of Appeals held that the common-law right of privacy is not inheritable.

The Court of Appeals rejected the trial court's definition of a "public figure" as too narrow. Still, the Court of Appeals affirmed the trial court's ruling. It formulated its own definition and held that Harold's name and likeness did not have "significant commercial value."

On appeal to this Court, Barbara has abandoned her common-law claims. Her arguments focus solely on allegations of error in interpreting KRS 391.170 by the courts below. Thus, Barbara's common-law claims are not at issue in this case. Therefore, we do not address or decide in this opinion: (1) whether there exists in the Commonwealth a common-law right of publicity that is distinct from the common-law right of privacy; (2) whether the common-law right of publicity (if it exists) is inheritable; or (3) whether any or all of the rights embraced by the right of privacy are inheritable.

## STATUTORY RIGHT OF PUBLICITY

The only issue before us concerns the proper construction of KRS 391.170, which creates a posthumous right of publicity and provides:

(1) The General Assembly recognizes that a person has property rights in his name and likeness which are entitled to protection from commercial exploitation. The General Assembly further recognizes that although the traditional right of privacy terminates upon death of the person asserting it, the right of publicity, which is a right of protection from appropriation of some element of an individual's personality for commercial exploitation, does not terminate upon death.

(2) The name or likeness of a person who is a public figure shall not be used for commercial profit for a period of fifty (50) years from the date of his death without the written consent of the executor or administrator of his estate.

The trial court's ruling turned on its interpretation of the term "public figure," as: "one who has vigorously sought the attention of a national audience and has achieved such a level of success that he is considered a national celebrity." The Court of Appeals disagreed with the trial court on this issue and implied that the trial court's definition was too narrow. Rather, the Court of Appeals concluded that a "public figure" was a person whose name and likeness had a "significant commercial value" and affirmed the trial court on grounds that Harold's name and likeness did not reach this threshold. We need not determine the correct definition of "public figure," because, as a matter of

**1.** Ky., 623 S.W.2d 882(1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982).

**2.** *Id.* at 887.

law, neither Harold's voice nor image was appropriated for "commercial profit" within the meaning of statute in the music video of John Michael's song "I Miss You a Little."

While the right of publicity at issue in this case is statutory, we believe that many of the principles of the common-law right of publicity can be used in reaching the proper construction of KRS 391.170.[3]

## COMMON LAW RIGHT OF PUBLICITY

The common-law right of publicity evolved from the appropriation prong of the right of privacy.[4] But *"it is a distinct cause of action* intended to vindicate different interests."[5] As originally postulated, the right of privacy protects one's right "to be let alone."[6] Whereas the right of publicity protects the right to control the commercial value of one's identity.[7] The appropriation prong of the invasion of privacy originally sought to compensate for the emotional distress accompanied by the unauthorized use of one's likeness and identity.[8] But as the tort has evolved, it is clearly the commercial interests in one's identity that the appropriation prong of tort serves to protect the most.[9] Further, as is stated in KRS 391.170, the interest

protected is considered a property right.[10] Thus, as the torts have evolved, the main differences between the appropriation prong of the right of privacy and the right of publicity concern questions of transferability and survivability.[11] Because the interests protected are nearly identical, our discussion below—which concerns the reach of the protection of one's commercial interests provided by both the common-law rights of publicity and privacy—refers only to the right of publicity.

## WHETHER BARBARA'S CLAIM IS ACTIONABLE

Both the common-law right of publicity and the statutory right created by KRS 391.170 can be read broadly to protect a wide variety of uses of a person's (or public figure's) identity. But the right of publicity is fundamentally constrained by federal and state constitutional protection of the freedom of expression.[12] Thus, the "use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity."[13] In order to determine whether a person's right of publicity has been appropriated, "the context and nature of the use is of preeminent concern."[14]

3. *See* Restatement (Third) of Unfair Competition § 46 comment a.

4. *Id.* at comment b.

5. Steven M. Fleischer, *The Right of Publicity: Preventing an Identity Crisis*, 27 N. Ky. L.Rev. 985, 988 (2000) (emphasis added).

6. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L.Rev. 193, 195 (Dec. 15, 1890).

7. Melville B. Nimmer, *The Right of Publicity*, 19 Law & Contemp. Probs. 203–04 (1954).

8. *See, e.g., Foster–Milburn Co. v. Chinn*, 134 Ky. 424, 120 S.W. 364, 365 (1909).

9. Restatement (Second) of Torts 652C comment a.

10. *Id.*

11. Restatement (Third) of Unfair Competition § 47 comment b.

12. *See, e.g., Hicks v. Casablanca Records*, 464 F.Supp. 426, 430 (S.D.N.Y.1978).

13. Restatement (Third) of Unfair Competition § 47 comment b.

14. *Guglielmi v. Spelling–Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454, 457 (Ca.1979) (Bird, C.J., concurring).

In this case, Harold's name, image, and voice were used in a music video. "Music, as a form of expression and communication, is protected under the First Amendment."[15] Likewise, "[e]ntertainment ... is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee."[16] Therefore, we have little difficultly in concluding that the music video in question is protected free expression under the U.S. and Kentucky Constitutions. Thus, under the general rule, Barbara's right of publicity claim is not actionable. Like all rules, an exception exists, but it does not apply in this instance.

The use of a person's name or likeness or other interest protected by the right of publicity may be actionable when used within a work that enjoys First Amendment protection, if the use is not sufficiently related to the underlying work,[17] or, if the otherwise constitutionally-protected work is "simply disguised commercial advertisement for the sale of goods or services."[18] In this case, the use of Harold's likeness is intimately related to the underlying work (the song and music video are both a tribute to him) and the music video itself is not a disguised commercial advertisement for the sale of compact discs of either the single, "I Miss You A Little," or the album upon which it appears. This remains true even though music videos can be and are viewed as promotional films for the sale of music.[19]

Most creative works are produced for sale and profit. This, of course, includes the songs that underlie music videos. While music videos are not produced primarily for the sale of the video but, rather, the underlying song, this does not strip them of their First Amendment protection. Music videos are in essence mini-movies that often require the same level of artistic and creative input from the performers, actors, and directors as is required in the making of motion pictures.[20] Moreover, music videos are aired on television not as advertisements but as the main attraction, the airing of which, consequently, is supported by commercial advertisements. Simply put, the commercial nature of music videos does not deprive them of constitutional protection.

The fact that a person's likeness is used in a constitutionally-protected work to create or enhance profits does not make the use actionable.[21] Nor does the use of that person's name or likeness in an advertisement or promotion for the underlying work infringe upon a person's right of publicity.[22] To put it another way, John

15. *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661, 674 (1989).

16. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671, 678 (1981).

17. *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87–88 (2nd Cir.1989).

18. *Frosch v. Grosset & Dunlap*, 75 A.D.2d 768, 427 N.Y.S.2d 828, 829 (1980).

19. Brittanica.com at http://www.brittanica.com/seo/m/music-video (May 31, 2001).

20. *See* Deborah Rouse, *The Artistic Realm of Music Video*, American Visions, June, 2000, *available at* htte://www.findarticles.com/cf_0/m1546/3_15/ 62724398/ print.jhtml.

21. *See, e.g., Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580, 585 (1984).

22. *See, e.g., Guglielmi*, 160 Cal.Rptr. 352, 603 P.2d at 462 ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise.")

Michael—without either the consent or approval of Harold's estate—could have produced a film biography of his father [23] and promoted the film using Harold's name and likeness [24] without violating Harold's estate's right of publicity (assuming it exists under the statute). He can do the same in a music video. *Accord, Parks v. LaFace Records.* [25]

In *Parks,* the music group Outkast included a song entitled "Rosa Parks" on one of its albums, without Ms. Parks' permission. [26] In 1955, Parks made a famous and heroic stance against racial inequality by refusing to give up her seat to a white person and move to the back of a bus. This single act of defiance sparked a bus boycott that ended segregation on public transportation in Montgomery, Alabama, which in turn was an important precursor to the Civil Rights Movement of the 1960s. Parks brought suit alleging *inter alia* that the use of her name violated her common-law right of publicity. [27]

After concluding that both the song and the song's title were entitled First Amendment protection, the district court stated, "The right of publicity is … inapplicable under the First Amendment if the content of an expressive work bears any relationship to the use of a celebrity's name." [28] Upon review of the song, the district court found that there was an obvious metaphoric and symbolic relationship between the lyrics of the song, which contained numerous references to going to the back of the bus, and its title, "Rosa Parks." [29] The district court then found, as a matter of law, that Parks' right of publicity claim was not applicable. [30] The district court further concluded the fact that Outkast profited from the sale of the song and album and heavily promoted the single, "Rosa Parks," did not affect this result. [31]

Like the song title "Rosa Parks" and its lyrics, there exists a genuine connection between the use of Harold's name likeness in the music video "I Miss You a Little" and the song of the same name. Thus, we hold as a matter of law that Barbara Montgomery's right of publicity claim, which was brought under KRS 391.170 on behalf of Harold Montgomery's estate, is inapplicable in this case.

For the reasons set forth above, we affirm the Court of Appeals.

LAMBERT, C.J.; COOPER, GRAVES, and WINTERSHEIMER, JJ., concur.

KELLER, J., dissents by separate opinion, with STUMBO, J., joining that dissenting opinion.

KELLER, Justice, Dissenting.

I respectfully dissent from the majority opinion because I believe the trial court's summary judgment in favor of Appellees was premature. In my opinion, the question of whether Harold Montgomery's name and likeness possessed commercial

**23.** *See, e.g., Seale v. Gramercy Pictures,* 949 F.Supp. 331, 338 (E.D.Pa.1996) (Use of Bobby Seale's name and likeness in the film "Panther" did not violate Seale's right of publicity.).

**24.** *See, e.g., Guglielmi,* 160 Cal.Rptr. 352, 603 P.2d at 462.

**25.** *Parks v. LaFace Records,* 76 F.Supp.2d 775 (E.D.Mich.1999).

**26.** *Id.* at 778.

**27.** *Id.* at 779.

**28.** *Id.* at 780, citing *Rogers v. Grimaldi,* 875 F.2d 994, 1004 (2nd Cir.1989).

**29.** *Id.*

**30.** *Id.*

**31.** *Id.* at 781.

value at the time of his death is inherently intertwined with both the determination of whether he was a public figure—upon which the trial court and Court of Appeals found summary judgment proper—and the question of whether Appellees' use of Harold Montgomery's name and likeness in a music video production constituted actionable "use for commercial profit" as defined in KRS 391.170(2)—the dispositive issue for today's majority. However, because the trial court erroneously narrowed the issue before it by defining a "public figure" as a "national celebrity" and limited pretrial discovery to investigation of the acclaim and exposure that Harold Montgomery enjoyed during his musical career, discovery regarding Harold Montgomery's possible commercial value remains incomplete. Although I question whether, even after full discovery, Appellant could produce evidence creating triable issues of fact, courts do not make summary judgment decisions by "eyeballing" the merits of the case, but by examining the evidence to determine whether genuine issues of material fact exist. Since Appellant has not yet had an opportunity to fully attempt to demonstrate the extent of any commercial value in Harold Montgomery's name and likeness, I believe summary judgment was improper, and I would remand the case to the trial court for it to reevaluate summary judgment after Appellant completes discovery.

## PUBLIC FIGURES AND PRETRIAL DISCOVERY

The lower courts found the dispositive issue in this case to be whether Harold Montgomery was a public figure whose rights of publicity survived his death. The trial court granted summary judgment because Appellant could not prove that Harold Montgomery "vigorously sought the attention of a national audience and has achieved such a level of success that he is considered a national celebrity." The Court of Appeals questioned the trial court's definition, but affirmed its conclusion because it found that Appellant had not demonstrated that Harold Montgomery's name and likeness possessed "significant commercial value." While I believe the Court of Appeals correctly framed the inquiry,[1] I question its conclusion because Appellants did not have the opportunity to develop all possible evidence as to Harold Mongomery's commercial value.

As one court has held, "[t]he defendant's act of misappropriating the plaintiff's identity, however, may be sufficient evidence of commercial value."[2] This evidentiary inference, of course, is most applicable when the appropriation involves commercial merchandising[3] or advertising,[4] but the principle has application in this case as well and demonstrates the difficulty of separating the "public figure" or "commercial value" inquiry from the determination of

1. *See Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 624 (6th Cir.2000) ("Landham correctly argues that he need not be a national celebrity to prevail. But in order to assert the right of publicity, a plaintiff must demonstrate that there is value in associating an item of commerce with his identity."); *Id.* ("To succeed then, Landham must show that a merchant would gain significant commercial value by associating an item of commerce with him.").

2. *Id.*

3. *Id.* (addressing right of publicity claim involving merchandising of action figure based on character Appellant portrayed in "Predator," a 1987 action film).

4. *See McFarland v. Miller,* 14 F.3d 912, 922 (3rd Cir.1994) (addressing right of publicity claim by former child actor—"Spanky" from the "Our Gang" films—against restaurant owner who named his restaurant after the actor and decorated it with "Our Gang" pictures).

whether the appropriation was done "for commercial profit." In this case, Appellant sought evidence through its discovery requests which may have demonstrated that Appellees appropriated Harold Montgomery's name and image because the Appellees recognized the commercial value in the appropriation, but Appellants found themselves limited by the scope of the discovery and the nature of the inquiry in the trial court.

Appellant initially submitted interrogatories to Appellee John Michael Montgomery seeking information relating to production research and profits associated with the "I Miss You A Little" video, but Appellee declined to answer many of these questions on the grounds that they would not lead to discoverable information and later obtained a protective order preventing discovery on these topics. During the Appellant's deposition of Appellee John Michael Montgomery, counsel for the Appellees, in accordance with the trial court's discovery limitations, objected to Appellant's questions concerning the song and music video, instructed his client not to answer the questions, and commented:

> Whoa. Objection. We're getting off track, Bill, let's get back on track. That doesn't have a damn thing to do with whether he's a public figure or not.... I'm objecting to any questions concerning the video, because it's not relevant for our purposes right now. So let's just move on.

In my opinion, the trial court's restrictions on Appellant's access to discovery materials relating to the marketing and production of music videos possibly pre-vented the Appellant from obtaining relevant evidence concerning Harold Montgomery's commercial value. While I agree with the Court of Appeals that Appellant has yet to demonstrate that Harold Montogmery's name and likeness possess any significant commercial value, "CR 56 was never intended to be a substitute for a court trial in cases where a party has not had an opportunity to present all the facts which might help lead the court to a just determination ...."[5] Now that the Court of Appeals has clarified the definition of "public figure," I believe that Appellant should be permitted the opportunity of full discovery to see whether they can produce evidence sufficient to create a genuine issue of material fact as to whether Harold Montgomery's name and likeness possessed significant commercial value. Accordingly, I would reverse the grant of summary judgment and remand this case to the trial court for that purpose.

## FREEDOM OF EXPRESSION

The majority concludes that Appellees' use of Harold Montgomery's name and likeness in the "I Miss You A Little" music video constitutes "protected free expression under the U.S. and Kentucky Constitutions,"[6] and thus finds no actionable claim under KRS 391.170's statutory right of publicity. We appear to be the first court to address a right-of-publicity action involving visual and audio depictions in a music video, and I have questions about the appropriateness of our decision to do so. Appellees have never—in the trial court, before the Court of Appeals, *or even*

**5.** *Sheppard v. Immanuel Baptist Church*, Ky., 353 S.W.2d 212, 214 (1961). *See also Steelvest, Inc. v. Scansteel Service Center*, Ky., 807 S.W.2d 476, 480 (1991) ("Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact. The trial judge must examine the evidence ...." (citation omitted)).

**6.** Majority Opinion at 60 S.W.3d 528, 529 (2001).

*before this Court*—made any claim that Appellant's claim was not actionable because it infringed upon their rights under the First Amendment to the United States Constitution.[7] I find this a stark contrast with the persuasive authority upon which the majority relies in which all of the defendants raised freedom of expression as an affirmative defense to the plaintiffs' right-of-publicity claims in the trial court.[8] I believe this Court mistakes its role when it sua sponte raises, addresses, and decides a constitutional issue which the parties have had no opportunity to argue. Although I agree with the majority that a substantial issue exists in this case as to whether Appellant's claim is actionable given the protections of the First Amendment, and I recognize that this is a question of law, I believe the trial court should make this determination on remand. At the very least, this Court should direct the parties to brief and/or reargue this issue. For reasons outlined below, I also disagree with the test under which the majority balances the interests involved.

First, I take issue with the majority's treatment of music videos as a medium inherently implicating core First Amendment expressive rights. In my opinion, the majority's analytical framework ignores the fact that the nature of modern television advertising makes it difficult to separate commercial speech from other forms of expression.[9]

Second, I believe the majority fundamentally mischaracterizes the nature of music videos when it states—without citation—that "music videos are aired on television not as advertisements but as the main attraction, the airing of which, consequently, is supported by commercial advertisements."[10] Even the limited evidentiary record in this case refutes the conclusion that music videos exist as art for art's sake. Appellee John Michael Montgomery's affidavit includes a statement, "The primary object of a music vid-

---

7. Nor has the Attorney General been notified of a constitutional challenge of the breadth of KRS 391.170. *See* KRS 418.075. *But see Priestley v. Priestley,* Ky., 949 S.W.2d 594, 596 (1997).

8. *Hicks v. Casablanca Records,* 464 F.Supp. 426 (S.D.N.Y.1978) (an opinion *by* a federal trial court); *Titan Sports, Inc. v. Comics World Corp.,* 870 F.2d 85, 87 (2nd Cir.1989) ("The district court found Comics World's product to be 'a *bona fide* newsstand publication' and concluded that this circumstance rendered its use of the photographs protected by the first amendment."); *Frosch v. Grosset & Dunlap,* 75 A.D.2d 768, 427 N.Y.S.2d 828, 829 (1980) ("Special term held that the book here involved is what it purportes [sic] to be, a biography, and as such did not give rise to a cause of action in favor of the estate for violation of a right of publicity."); *Stephano v. News Group Publications, Inc.,* 64 N.Y.S.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580, 581 (1984) ("The trial court granted summary judgment to the defendant concluding that the article reported a newsworthy event of fashion news, and was not published for trade or advertising purposes."); *Seale v. Gramercy Pictures,* 949 F.Supp. 331 (E.D.Pa.1996) (another opinion *by* a federal trial court); *Parks v. LaFace Records,* 76 F.Supp.2d 775 (E.D.Mich.1999) (yet another opinion *by* a federal trial court); *Rogers v. Grimaldi,* 875 F.2d 994, 997 (2nd Cir.1989) ("The District Court granted summary judgment to the defendants. Judge Sweet found that defendants' use of Rogers' first name in the title and screenplay of the film was an exercise of artistic expression rather than commercial speech.").

9. *See* Alex Kozinksi & Stuart Banner, "Who's Afraid of Commercial Speech?" 76 Va. L.Rev. 627, 638–641 (1990) (discussing commercial speech in the context of persuasive television advertisements and music videos and concluding that "the distinction between commercial and noncommercial speech is extraordinarily difficult to make in any satisfactory way.").

10. Majority Opinion at 60 S.W.3d 529, 530 (2001).

eo is to promote the artist," and the entire context of the music video business is premised on promotion and advertisement:

> [R]ecord labels produce music videos to promote the sale of albums.... A music video stands to an album the same way that a movie "trailer" or "teaser" stands in relation to a movie; it represents an attempt to entice a customer to purchase the right to hear or see the larger work. Indeed, music videos are "doubly" commercial speech. MTV, VH1, the Nashville Network, and other music-video cable channels select and show the videos that they believe will generate the highest advertising reve-

nue. The video channels' unwillingness to broadcast controversial materials—materials likely to spook boycott-wary advertisers—provide additional evidence of the essentially commercial nature of the undertaking.[11]

Even the primary authority relied upon by the majority, *Parks v. LaFace Records*,[12] recognizes that music videos are one of many tools used to promote and advertise bands and albums.[13] Other courts have made similar observations in matters involving the music industry.[14]

Of course, a profit-motive, standing alone, will strip an expressive work of its constitutional protection. However, "the state's interest in preventing the outright

---

**11.** Ronald J. Krotoszynski, Jr., "Into the Woods: Broadcasters, Bureaucrats, and Children's Television Programming," 45 Duke L.J. 1193, 1219 n. 128 (1996). *See also* Kozinksi & Banner, *supra* note 9 at 641 ("These three-minute films sometimes tell stories, sometimes depict the musicians performing their songs, sometimes are little more than mind-numbing collections of smoke and special effects. Music videos serve one overriding purpose: to promote record sales."); Robert G. Martin, "Music Video Copyright Protection: Implications for the Music Industry," 32 UCLA L.Rev. 396, 397 (1984) ("Virtually every popular music artist releasing a record now releases one or more music videos for promotional purposes and the effectiveness of music videos as advertising tools for the $3.8 billion record and tape sales industry is beyond question."); John A. Rogosta, "Proceedings of the Canada–United States Law Institute Conference: NAFTA Revisited: The Cultural Industries Exemption from NAFTA—Its Parameters," 23 Can.-U.S. L.J. 165, 173 (1997) ("[M]usic video channels get music videos for free ... because it is viewed as a commercial.").

**12.** *Supra* note 8.

**13.** *Id.* at 778 (grouping the "Rosa Parks" music video with other customary music business advertising and promotion devices).

**14.** *See Morrill v. The Smashing Pumpkins*, 157 F.Supp.2d 1120, 1123 (C.D.Cal.2001) (a copyright infringement action involving the

Smashing Pumpkins' use of footage from "a music video created to *promote* Defendant [and former Smashing Pumpkin] Corgan and his [former] band, The Marked." (emphasis added)); *Tsiolis v. Interscope Records, Inc.*, 946 F.Supp. 1344, 1349 (N.D.Ill.1996) (a trademark infringement action against Andre Young's (a.k.a."Dr.Dre") post-Death Row Records record label, Aftermath Entertainment, in which the court listed a music video among "promotional materials" which also included a magazine print advertisement, a bumper sticker, a t-shirt, and a poster); *New Line Cinema Corp. v. Bertlesman Music Group, Inc.*, 693 F.Supp. 1517 (S.D.N.Y.1988) (a copyright action involving dueling Nightmare on-Elm-Street-themed rap videos in which the court noted that: "Testimony established that the songs promoted by the two videos are in direct competition in the rap music market. Certainly, with two competing videos in the music marketplace, each video will get less promotional time on MTV. The decrease in air time of the Fat Boys video will undoubtably result in lower album sales for the Fat Boys."); *Poley v. Sony Music Entertainment, Inc.*, 163 Misc.2d 127, 619 N.Y.S.2d 923, 924 (N.Y.Sup.Ct.1994) (breach of contract suit by minor band against record company in which the court observed that the defendant advanced funds to the group for "the promotion of the album and the group through music videos.").

misappropriation of ... intellectual property by others is not automatically trumped by the interest in free expression or dissemination of information; rather, ... the state law interest and the interest of free expression must be balanced, according to the relative importance of the interests at stake."[15] In my opinion, the litmus test the majority appropriates from *Parks*—"The right of publicity is ... inapplicable under the First Amendment if the content of an expressive work bears any relationship to the use of a celebrity's name"[16]—puts the cart before the horse by presupposing the nature of the work itself without regard to questions raised by its content. Under the logic of the majority opinion, any use in a music video of even another recording artist's—for example, Appellee John Michael Montgomery's—name or likeness would fall within the protections of the First Amendment if the music video's content had any, presumably even a tangential or symbolic, relationship to the appropriated recording artist's identity. In my opinion, the governmental interest in protecting persons from such appropriations demands greater protection than an amorphous "any relationship" test can accommodate. Accordingly, I believe the majority commits a mistake by applying it in this case to a work which falls within the gray areas between commercial speech and other forms of expression.

Recently, in *Comedy III Productions, Inc. v. Saderup*,[17] the Supreme Court of California addressed the tension between California's statutory right of publicity and First Amendment free expression principles in the context of an action brought against a defendant who created and sold lithographs and T-shirts bearing a likeness of The Three Stooges. Turning to copyright law for guidance, the court focused its inquiry upon how the larger work utilized the images it appropriated and found that the appropriate inquiry in such cases is whether the manner in which another person's intellectual property is used "transforms" it into an independently expressive work:

> [T]he first fair use factor—"the purpose and character of the use"—does seem particularly pertinent to the task of reconciling the rights of free expression and publicity. As the Supreme Court has stated, the central purpose of the inquiry ... "is to see, in Justice Story's words, whether the new work merely 'supersedes the objects' of the original creation [citations], or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, wither and to what extent the new work is 'transformative.' ..."

This inquiry into whether a work is "transformative" appears to us to be necessarily at the heart of any judicial attempt to square the right of publicity with the First Amendment. As the above quotation suggests, both the First Amendment and copyright law have a common goal of encouragement of free expression and creativity, the former by protecting such expression from government interference, the latter by protecting the creative fruits of intellectual and artistic labor. The right of publicity, at

---

**15.** *Comedy III Productions, Inc. v. Saderup*, 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797, 806 (2001).

**16.** *Parks v. LaFace Records, supra* note 8 at 780 (applying the litmus test to the use of a public figure's name in a musical composi-

tion); *Rogers v. Grimaldi, supra* note 8 at 1004 (applying the test to a cinematic release).

**17.** *Supra* note 15.

least theoretically, shares this goal with copyright law. When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of expression without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist.

On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity.... Accordingly, First Amendment protection of such works outweighs whatever interest the state might have in enforcing the right of publicity. The right-of-publicity holder continues to enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity.

...

We emphasize that the transformative elements or creative contributions that require First Amendment protection ... can take many forms, from factual reporting to fictionalized portrayal, from heavy-handed lampooning to subtle social criticism.

Another way of stating the inquiry is whether the celebrity likeness is one of the "raw materials" from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness. And, when we use the word "expression," we mean expression of something other than the likeness of the celebrity.[18]

In my opinion the *Comedy III Productions, Inc.* test reconciles the competing interests more appropriately than the one utilized by the majority. And, because the commercial value of an appropriated name or likeness can be relevant to the inquiry of whether a work is "transformative,"[19] I believe we should remand this case to the trial court for it to engage in this balancing with all the appropriate evidence before it.

STUMBO, J., joins this dissent.

18. *Id.* at 808–809.

19. *See Id.* at 810:

Furthermore, in determining whether a work is sufficiently transformative, courts may find useful a subsidiary inquiry, particularly in close cases: does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted? If this question is answered in the negative, then there would generally be no actionable right of publicity. When the value of the work comes primarily from some source other than the fame of the celebrity—from the creativity, skill, and reputation of the artist—it may be presumed that sufficiently transformative elements are present to warrant First Amendment protection.