**FLIGHTSAFETY INTERNATIONAL INC., Plaintiff,**

v.

**FLIGHT OPTIONS, LLC, Defendant.**

**No. 05 CV 1811 ILG.**

United States District Court,
E.D. New York.

Dec. 8, 2005.

Steven A. Berger, Kenneth J. Applebaum, Berger & Webb, LLP, New York, New York, for Plaintiff.

Lauren J. Resnick, Josette M. Grippo, Baker & Hostetler, LLP, New York, New York, for Defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

Defendant Flight Options, LLC ("Flight Options" or "defendant") has filed a motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). In this diversity case, defendant argues that plaintiff Flightsafety International Inc. ("FlightSafety" or "plaintiff") has failed to plead the essential element of damages in its breach of contract claims arising out of two different agreements between the parties. Further, defendant asserts that any claim for damages resulting from one of the agreements is barred by an integration clause.

For the reasons set forth below, the Court grants the motion in its entirety.

### BACKGROUND

The facts as set forth below are drawn from the complaint, the allegations of which the Court accepts as true solely for purposes of this motion to dismiss. FlightSafety is a New York corporation with its principal place of business at the Marine Air Terminal at LaGuardia Airport in Flushing, New York. (Compl.¶ 3). It provides aviation services, including the training of pilots, technicians and flight attendants. (Id.). Flight Options is a Delaware limited liability company with its principal place of business in Ohio and has business operations in New York. (Id. ¶ 4). It provides fractional jet ownership services through which customers share the use of airplanes that it operates. (Id.).

In or about March 1999, FlightSafety and Flight Options, then doing business as Corporate Wings/Flight Options, entered into a contract effective as of January 1, 1999, pursuant to which FlightSafety agreed to serve as Flight Options' exclusive pilot training provider at least twice a year for a five-year term ending December 31, 2003. (Compl.¶ 7). In return for Flight Options' commitment to enroll at least fifty percent of its pilots in the full service training program involving 26 different types of aircraft, FlightSafety provided Flight Options discounted rates for the training sessions. (Id. ¶¶ 9, 10, Exh. B ¶ 1). The aircrafts which were the subject of the 1999 contract included, but were not limited to, the Beechjet 400A, Hawker 800XP, CitationJet and King Air 200. (Id. Exh. A ¶ C, Exh. B, Rev.App. C). FlightSafety offered Flight Options a discount from its standard prices based on Flight Options' commitment to use FlightSafety exclusively as its training provider for at least fifty percent of its pilots. (Id. ¶ 11, Exh. A, ¶ H.8).

It was agreed that Flight Options would be in default of the agreement if it failed "to comply with the exclusivity requirement." (Compl.Exh. A, ¶ L(1)). "Upon the occurrence of any Event of Default, and at any time thereafter, so long as the same shall be continuing, either party may terminate this Agreement with notice to the other party." (Id. Exh. A, ¶ M).

After the 1999 contract was executed, Flight Options requested that the prices be lowered, which caused the parties to enter into an amendment to that contract. (Id. ¶ 13). In the amended contract, FlightSafety reduced its rates further from those set forth in the original agreement (the agreement effective as of January 1, 1999, as amended, is referred to herein as the "1999 Contract"). (Id. ¶ 14).

Flight Options allegedly failed to meet its obligations under the 1999 Contract. (Compl.¶ 18). As a result, by notice dated January 29, 2001, FlightSafety informed Flight Options of its belief that it was in default of the 1999 Contract. (Id. ¶ 25 & Exh. C). Flight Options failed to remedy the alleged breach. (Id. ¶ 26).

In April 2002, the parties entered into a five-year Agreement for Training, which

was effective as of April 1, 2002 (the "2002 Contract"). (Compl.¶ 27). Pursuant to that contract, Flight Options agreed in return for discounted rates to use Flight-Safety exclusively for its entire pilot training requirements for four specified aircraft, which were also the subject of the 1999 Contract. (*Id.* ¶¶ 28, 29). Those aircrafts were the "New" Beechjet 400A, Hawker 800 XP, CitationJet and King Air 200. (*Compare id.* Exh. B, Rev.App. C *with* Exh. D, App. A). Therefore, the subject matter of the 2002 Contract was identical to the 1999 Contract, the only difference between the two being the number of airplanes that were the subject of each contract.

"Default" is defined in the 2002 Contract as follows: "If Flight Options trains with another company, except in the event of a Force Majeure or as otherwise set forth in Paragraph 5, the discounts set forth in Paragraph 3 shall terminate with immediate effect. Additionally, FlightSafety shall be entitled to recover any legal and other reasonable expenses incurred in the collection of past due accounts." (Compl.Exh. D, ¶ 9). Neither party could recover for "loss of profits, special, incidental, or consequential damages" as a result of a breach by the other party. (*Id.* ¶ 14). The 2002 Contract contains a standard integration clause which states that "[t]his Agreement constitutes the entire Agreement between the parties and supersedes all previous negotiations, representations, undertakings and agreements heretofore made between the parties with respect to its subject matter." (Compl.Exh. D, ¶ 19). Both the 1999 Contract and 2002 Contract are to be governed by New York law. (*Id.* ¶¶ 27, 32).

Between April 2002 and December 2003, FlightSafety provided pilot training for Flight Options pilots pursuant to the 2002 Contract. (Compl.¶ 33). As part of the services it offered, FlightSafety built two multi million dollar simulators and hired seven additional instructors to meet Flight Options' training requirements. (*Id.*). In December 2003, Flight Options notified FlightSafety that effective January 1, 2004, it would be using another company to provide pilot training for three aircrafts—Hawker 800 XP, Beechjet 400A and CitationJet—which were the subject of the 2002 Contract. (*Id.* ¶ 34 & Exh. E). In a letter from the CEO of Flight Options to Flight Safety's President, Flight Options stated that its decision resulted from "an arduous process of examining [its] alternatives" based on "pricing and [the company's] duty to [its] shareholders, not by dissatisfaction with FlightSafety." (*Id.*). At that time, Flight Options entered into a three-year agreement, with an option for two additional years, with CAE SimuFlite ("CAE"), a competitor of Flight-Safety's, pursuant to which Flight Options would train all of its pilots at CAE's Dallas–Forth Worth center. (*Id.* ¶ 37).

Consequently, by letter dated January 26, 2004, FlightSafety sent Flight Options written notice of its belief that it had breached the 2002 Contract, and demanded damages arising from the alleged breach. (Compl.¶ 40). In that same letter, FlightSafety reiterated its belief that Flight Options was also in breach of the 1999 Contract. (*Id.* ¶ 41). To date, Flight Options has rejected FlightSafety's demands. (*Id.* ¶ 43).

FlightSafety asserts that it is entitled to damages in an amount no less than five million dollars for Flight Options' breach of the 1999 Contract based on, among other things, a) "[f]ailing to enroll a minimum of 50% of its pilot roster for training twice a year"; b) "[r]epudiating the 1999 Contract by canceling in January 2001 training for most of the 1999 Contract Aircraft"; c) "[f]ailing to use FlightSafety as its exclusive training provider"; and d) "[f]ailing to

participate in FlightSafety's New Hire Screening program." (Compl.¶ 47). Flight Safety alleges that it is entitled to damages in an amount no less than eleven million dollars for Flight Options' breach of the 2002 Contract based on, among other things, a) "[f]ailing to use FlightSafety as its exclusive training provider"; and b) "[s]igning an exclusive agreement with FlightSafety's competitor, CAE, for all of its aviation training services." (*Id.* ¶ 52).

In lieu of answering the complaint, Flight Options filed this motion seeking dismissal of the complaint under Fed. R.Civ.P. 12(b)(6).

### DISCUSSION

### I. The Standard For Dismissal Under Fed.R.Civ.P. 12(b)(6)

 A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted only if it appears beyond doubt that a plaintiff can prove no set of facts in support of its claims which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Therefore, on a motion to dismiss, all factual allegations of the complaint must be accepted as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and all reasonable inferences must be made in plaintiff's favor. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) (citation omitted). In deciding this motion, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Here, plaintiff's claims are for breach of contract and it attaches both of the relevant contracts to

the complaint. Therefore, the Court may consider the contracts in deciding whether plaintiff states a claim for relief. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Because the interpretation of contracts generally is a question of law to be determined by the Court, it may dismiss the complaint where the contracts are unambiguous and do not support the plaintiff's claim. *See Furniture Consultants, Inc. v. Datatel Minicomputer Co.,* 1986 WL 7792, at *2 (S.D.N.Y. July 10, 1986).

### II. The Breach of Contract Claims

#### A. General Contract Principles Under New York Law

 Defendant argues that plaintiff fails to state a claim for breach of contract because the plain language of the 1999 Contract and the 2002 Contract does not provide the relief which it seeks in the complaint. Under New York law, "[t]o establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *National Market Share, Inc. v. Sterling National Bank,* 392 F.3d 520, 525 (2d Cir.2004). Defendant assumes for purposes of this motion that plaintiff has satisfied elements one and two of its breach of contract claims and argues that plaintiff's failure to satisfy the third element warrants summary dismissal of the complaint. (Def.'s Mem. at 5).

 Where contracts are unambiguous, courts must effectuate their plain language. *See, e.g., Slamow v. Del Col,* 79 N.Y.2d 1016, 1018, 584 N.Y.S.2d 424, 425, 594 N.E.2d 918, 919 (1992) (stating that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing"). "Contract language is unambiguous when it has 'a definite and precise meaning, unattended by danger of

misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). By contrast, ambiguous language is language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Associates v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) (internal quotation marks omitted). Unambiguous contract language is not rendered ambiguous by competing interpretations of it urged in litigation. *Photopaint Technologies, LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir.2003) (citations omitted).

### B. Plaintiff's Claim for Breach of the 2002 Contract

█ Regarding the claim for breach of the 2002 Contract, defendant argues that plaintiff is precluded from recovering the damages it seeks, specifically, lost profits as a result of the alleged breach, based on the unambiguous language in that agreement. The Court agrees. Paragraph nine of the 2002 Contract states that if Flight Options fails to utilize FlightSafety as its exclusive resource for the training of its pilots, then the agreement "shall terminate with immediate effect." In that event, FlightSafety "shall be entitled to recover any legal and other reasonable expenses incurred in the collection of past due accounts." Further, paragraph fourteen of the 2002 Contract states that "[i]n no event shall either party be liable for loss of profits, special, incidental, or consequential damages arising out of the breach of any

provision of this Agreement." Read together, these two paragraphs unambiguously limit FlightSafety's damages, as a result of Flight Options' breach, to collecting any unpaid accounts as of the termination of the 2002 Contract which occurred by letter dated December 5, 2003 and effective as of January 1, 2004. However, in the complaint, plaintiff seeks damages solely for defendant's failure to use FlightSafety as its exclusive training provider and for signing an exclusive agreement with CAE. (Compl.¶ 52). Based on the plain language of paragraphs nine and fourteen of the 2002 Contract, plaintiff cannot recover these damages for the alleged breach. *See, e.g., General Electric Capital Corp. v. Domino's Pizza Inc.*, 1994 WL 256776, at *3 (S.D.N.Y. June 2, 1994) ("when interpreting a contract [courts] must consider the entire contract and choose the interpretation of [the clause or paragraph at issue] which best accords with the senses of the remainder of the contract") (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992)) (brackets in original).

Plaintiff's attempt in its opposition papers to have the Court read paragraphs nine and fourteen in isolation is inconsistent with well established principles of contract construction, which require that all provisions of a contract be read together as a harmonious whole, if possible. *See, e.g., Enercomp, Inc. v. McCorhill Publishing*, 873 F.2d 536, 549 (2d Cir.1989) (rejecting parties' construction of contract as "somewhat at odds with the agreement as a whole"). Further, plaintiff argues that if it was precluded from recovering the damages it seeks as a result of the alleged breach of the 2002 Contract, this would render defendant's obligations illusory. However, the plain language of the 2002 Contract is clear that both parties are relieved from liability for, *inter alia*, "loss of profits," in the event that there is a breach of any provision of the agreement.

Far from being illusory, this provision is mutual. Plaintiff's benefit from the 2002 Contract was, among other things, defendant's agreement to utilize plaintiff's exclusive services. *See Poley v. Sony Music Entertainment, Inc.*, 163 Misc.2d 127, 133, 619 N.Y.S.2d 923, 926 (N.Y.Sup.1994) ("The Contract is not rendered 'illusory' merely because Poley's remedies against Sony are limited. His benefit was to come not from assured royalties (the Contract contains no such assurances), but from the opportunity to make albums, an opportunity which Poley would not probably have had otherwise"); *cf. Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917) (stating that a promise may be lacking in an agreement, yet the agreement nevertheless "may be 'instinct with an obligation,' imperfectly expressed") (citation omitted) (Cardozo, J.).

Moreover, in the event that defendant terminated the exclusivity arrangement, it was required to pay the non-discounted price for any subsequent training services, and plaintiff had the right to, among other things, recover its legal fees incurred in collecting any past due balance. This is sufficient consideration for the provision in the 2002 Contract which limited the damages that plaintiff could recover in the event that defendant refused to utilize plaintiff exclusively for the training of its pilots.

 Even if the Court did find that the 2002 Contract was illusory because defendant had a right to terminate it without incurring liability (which as indicated above it does not), plaintiff's argument is unpersuasive because the parties performed under the contract. It is well-established that the "absence of mutuality of obligation may be remedied by the subsequent conduct of the parties." *Ferguson v. Ferguson*, 97 A.D.2d 891, 892, 470 N.Y.S.2d 715, 716 (3d Dep't 1983) ("Plaintiff's claim that the agreement is illusory . . . because defendant can terminate the contract at will and plaintiff has no such right is without merit" where the "parties operated under the contract for some five years prior to the commencement of this lawsuit").

In opposing defendant's motion, plaintiff also argues that nothing in the 2002 Contract precludes it from recovering general damages as a result of the alleged breach. Plaintiff cites *ATI Telecom, Inc. v. Trescom International, Inc.*, 1996 WL 455010, at *2 (S.D.N.Y. Aug.12, 1996) as authority for this proposition.[1] There, ATI sought to recover damages for defendant's alleged breach of a contract pursuant to which plaintiff purchased long-distance telephone services from defendant. After entering into the agreement, defendant never provided any services to plaintiff, and thus, to satisfy its obligations to its customers, ATI "obtained long-distance telephone services from other sources—but at a substantially increased cost." *Id.* at *1. Therefore, unlike plaintiff in this case, the plaintiff in *ATI Telecom, Inc.* was able to purchase the services from a third-party that were the subject of the contract that was allegedly breached.

On defendant's summary judgment motion, the court in *ATI Telecom, Inc.* interpreted a damages clause similar to the one in this case.[2] The court first noted the

1. The only other case which plaintiff cites for this proposition, *American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989), discusses in general terms the differences between general damages and special damages, but does not address a contractual provision such as the one at issue in *ATI Telecom, Inc.* or this case.

2. That clause stated that "In no event will either party under this Agreement be liable for indirect, consequential, special, incidental or punitive damages, or lost profits, revenue,

difference between general damages, those that place the injured party "in the same position it would have been in had the contract been performed," with other types of damages recoverable for breach of contract, including lost profits, "[c]onsequential, special, indirect, and incidental damages." *Id.* at *2. The court denied defendants' summary judgment motion because the plaintiff was not only seeking to recover its lost profits, as plaintiff does here. It stated in relevant part, that "ATI can recover the difference between the price it would have paid for long-distance telephone services under the [a]greement and the price it eventually paid to obtain that service elsewhere. This aspect of damages is ATI's increased *cost* in obtaining the telephone service, not its lost profits." *ATI Telecom, Inc.*, 1996 WL 455010, at *3 (emphasis in original). In contrast, here, plaintiff's claim for damages under the 2002 Contract is bottomed on its request for recovery of the lost profits it would have earned absent defendant's decision not to engage plaintiff's services exclusively for the training of its pilots effective on January 1, 2004. While plaintiff claims to be seeking general damages in this case, it is really seeking to recover its "lost profits" as a result of the alleged breach of the 2002 Contract. The 2002 Contract expressly forbids this type of recovery.

It is well-established that parties entering into a commercial relationship may, as the parties did here, limit their liability in the event of a breach of their agreement. *See, e.g., Owens–Corning Fiberglas Corp. v. U.S. Air*, 853 F.Supp. 656, 665–66 (E.D.N.Y.1994) (liability limitation clauses "limit recovery not only for breach of contract, but also based on other legal theories"). Accordingly, under New York law, "a party in a contract action is gener-

ally confined to the remedies found in the contract." *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F.Supp. 1012, 1016 (E.D.N.Y.1996), *aff'd*, 125 F.3d 845, 1997 WL 609029 (2d Cir.1997).

Finally, plaintiff asserts that defendant's motion should be denied because, at minimum, it is permitted to recover the discounts it granted defendant while the 2002 Contract was operative. This argument, however, cannot be reconciled with the following language of the contract: "If Flight Options trains with another company . . . the discounts set forth in Paragraph 3 shall terminate with immediate effect. Additionally, FlightSafety shall be entitled to recover any legal and other reasonable expenses incurred in the collection of past due accounts." There is nothing in the 2002 Contract which grants plaintiff the right to recover the difference between the market prices versus the discount prices charged to defendant during the term of exclusivity.

Therefore, based on the unambiguous language in the 2002 Contract, plaintiff's breach of contract claim is dismissed.

## C. Plaintiff's Claim for Breach of the 1999 Contract

Defendant argues that plaintiff's claim for breach of the 1999 Contract is barred by the integration clause of the 2002 Contract quoted above. Defendant is correct.

"Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 476 (S.D.N.Y.1988) (citations

---

customers, goodwill or opportunity, of any kind whatsoever, resulting from a breach of this Agreement by such party." *ATI Telecom, Inc.*, 1996 WL 455010, at *1.

omitted). Plaintiff argues that the integration clause in the 2002 Contract does not render the 1999 Contract totally inapplicable because it contends that the subject matter of the 1999 Contract was broader than the 2002 Contract. However, the fact that the 1999 Contract included more than twenty-six planes on which Flight Options pilots would be trained, while the 2002 Contract covered only four of those planes, is a distinction without a difference. The subject matter of both contracts was the training of defendant's pilots. *See generally Universal Reinsurance Co. Ltd. v. St. Paul Fire and Marine Ins. Co.*, 1999 WL 771357, at *7 (S.D.N.Y. Sept.29, 1999) ("Even in the absence of an integration and merger clause, a subsequent contract regarding the same subject matter supersedes the prior agreement.").

Plaintiff's reliance on *Kreiss v. McCown De Leeuw & Co.*, 37 F.Supp.2d 294, 301 (S.D.N.Y.1999) is unpersuasive. In *Kreiss*, the defendants sought to rely on an integration clause in a stockholders agreement to bar a claim for stock options predicated on a term sheet entered into between the parties earlier which provided promises of equity and stock options. *Kreiss*, 37 F.Supp.2d at 301. The court rejected that argument, finding that the stockholders agreement was "silent with respect to how much equity and stock options [p]laintiffs were to receive," and therefore, "[b]ecause the subject matter of the Stockholders Agreement does not cover the specific award to [p]laintiffs of equity and stock options, the agreement does not supersede the Term Sheet in that regard." *Id.* In contrast, here, both contracts cover the same subject matter—the pricing agreement for plaintiff to train defendant's pilots. Thus, the integration clause in the 2002 Contract extinguishes plaintiff's claims under the 1999 Contract.

### D. Plaintiff's Claims for Breach of the Covenant of Good Faith and Fair Dealing

The complaint appears to allege claims for breach of the covenant of good faith and fair dealing based on the same facts giving rise to plaintiff's breach of contract claims. (Compl.¶¶ 47, 52). To the extent that plaintiff is alleging such claims, they are dismissed because they are redundant of the breach of contract claims. *See, e.g., National Market Share, Inc.*, 392 F.3d at 525 ("In New York, breach of the implied duty of good faith and fair dealing is merely a breach of the underlying contract") (citation and internal quotation marks omitted); *B. Lewis Productions, Inc. v. Angelou*, 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) ("under New York law, because the covenant of good faith and fair dealing is 'part and parcel' of the underlying contract, a party does not have a separate cause of action for breach of the covenant of good faith and fair dealing based on the same facts as the breach of contract claim") (citations omitted).

### CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss the complaint in its entirety. The Clerk of Court is therefore respectfully directed to enter judgment on behalf of defendant and to close this case.

SO ORDERED.